IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. A. No. 1:17-cv-01866 ) |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD") of the Federal Bureau of Investigation (the "FBI"), located in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 248 employees who staff a total of twelve (12) FBI Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct,

and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.

(3)     The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(4)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests made pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a.  Specifically, I am aware of the FBI's response to Plaintiff's FOIA request seeking "any and all records pertaining to Attorney General Loretta Lynch's meeting with former President Bill Clinton on June 27, 2016, which occurred on her airplane at the Sky Harbor International Airport in Phoenix, Arizona."

(5)     In response to Plaintiff's request, the FBI found and processed a total of twenty-nine pages.  Of the twenty-nine pages, nine pages were released in full and twenty pages were released in part.

(6)     In accordance with *Vaughn v. Rosen*, 484 F.2d 280 (D.C.Cir. 1973), this declaration is being submitted in support of defendant's motion for summary judgment.  This declaration provides the Court and Plaintiff with an explanation of the FBI's recordkeeping system, the procedures used to search for, review, and process the responsive records, and of the FBI's justification for withholding records in full or in part pursuant to FOIA Exemptions (b)(6)

and (b)(7)(C); and DOJ OIP's justification for withholding of records pursuant to FOIA

Exemptions (b)(5) and (b)(6).[1]

## PLAINTIFF'S FOIA REQUEST
### (1355324-000 and -001)

(7)      By letter dated July 15, 2016, attached hereto as Exhibit A, Plaintiff submitted a

FOIA request to the FBI seeking "any and all records pertaining to Attorney General Loretta

Lynch's meeting with former President Bill Clinton on June 27, 2016, which occurred on her

airplane at the Sky Harbor International Airport in Phoenix, Arizona." Plaintiff's request letter

stated that unless otherwise indicated, the timeframe of records requested is from June 13, 2016,

to the date the request was processed. Specifically, Plaintiff asked the FBI to produce the

following records:

### *Records Regarding Names of DOJ Officials Involved in Meeting-Related Discussions or Decisions*

1.      Any and all records containing the names of any DOJ official, staff or
        employee who participated in any discussion regarding the meeting
        between General Lynch and Bill Clinton that occurred on Monday, June
        27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

2.      Any and all records containing the names of any DOJ official, staff or
        employee who participated in any decision on or determination of whether
        clearance, authorization or permission should be granted or in fact would
        be granted to Bill Clinton to board General Lynch's airplane on Monday,
        June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

3.      Any and all records containing the names of any person present in the
        passenger compartment of General Lynch's airplane during the meeting

---

[1] The Department of Justice's Office of Information Policy ("DOJ OIP") asserted Exemptions
(b)(5) and (b)(6) to withhold certain information on Bates pages FBI-2, 3, 12, 13, 23, and 24.
Portions of these pages are duplicative of material or information under consideration in pending
civil action, *American Center for Law and Justice v. United States Department of Justice*, No.
16-CV-2188 (D.D.C.) (TJK), where Plaintiff challenged DOJ OIP's assertion of Exemption
(b)(5) in these records, but did not challenge DOJ OIP's Exemption (b)(6) withholdings.

between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

### Records Regarding Meeting-Related Discussions or Decision

4. Any and all records, communications or briefings prepared, sent, received or reviewed by General Lynch or any other DOJ official, staff or employee, *before* the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona, containing any discussion of or in any way regarding the meeting.

5. Any and all records, communications or briefings prepared, sent, received or reviewed by General Lynch or any other DOJ official, staff or employee, *at any time,* containing any discussion of or in any way regarding the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

6. Any and all records prepared, sent, received or reviewed by General Lynch or any other DOJ official, staff or employee, at any time, containing any discussion of or in any way regarding the decision to grant clearance, authorization or permission to Bill Clinton to board General Lynch's airplane on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

### Records Regarding Communication Received from Bill Clinton or Regarding His Presence

7. Any and all records of any communication or briefing received by General Lynch, any DOJ official, staff or employee from Bill Clinton or his staff regarding the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona, *regardless of whether the communication or briefing was received before, during, or after the meeting.*

8. Any and all records of any communication or briefings by which General Lynch was advised that Bill Clinton was present at the Sky Harbor International Airport in Phoenix, Arizona, on Monday, June 27, 2016.

### Records Regarding Any Decision of Bill Clinton

9. Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ

4

official or employee or any other person *from June 13, 2016 to Sunday, June 26, 2016*, containing any discussion of or in any way naming, regarding, involving, or referencing Bill Clinton.

10.    Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee on Monday, June 27, 2016, containing any discussion of or in any way naming, regarding, involving or referencing Bill Clinton, regardless of whether the communication or briefing was prepared or sent before, during or after the meeting between General Lynch and Bill Clinton.

11.    Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee on Tuesday, June 28, 2016, or *after*, containing any discussion of or in any way naming, regarding, involving or referencing Bill Clinton.

### Records Regarding Discussion of Ethics Rules or Professional Codes of Conduct Governing Attorneys

12.    Any and all records of any communications or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *before* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any discussion of ethics rules or DOJ Standards of Conduct governing attorneys in connection with the meeting *or* Lynch's relationship with Bill Clinton.

13.    Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *after* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any discussion of ethics rules or DOJ Standards of Conduct governing attorneys in connection with the meeting *or* Lynch's relationship with Bill Clinton.

14.    Any and all records, communications or briefings prepared, sent, received or reviewed by General Lynch, her staff, any DOJ official or employee, regarding or containing any discussion of the contents or requirements of 5 C.F.R. § 45.2 in connection with the meeting *or* Lynch's relationship with Bill Clinton.[]

***Records Regarding Discussion of or Decisions on Response to Press***

15. Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *after* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any *discussion of the press, responding to the press, or the content of any press release or public* statements in connection with the meeting.

16. Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *after* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any *decision regarding the press, responding to the press, or the content of any press release or public* statements in connection with the meeting.

(8)   Plaintiff also requested expedited processing and a waiver of all search and duplication fees associated with its request.  In addition, Plaintiff provided a Memorandum in Support of Requested Fee Waiver and Expedited Processing.  (***See* Exhibit A.**)

(9)   By letter dated August 5, 2016, attached hereto as Exhibit B, the FBI acknowledged receipt of Plaintiff's FOIA request and assigned it FOIPA Request Number 1355324-000. The FBI further advised (1) it was searching for responsive information; (2) considering the fee waiver request; and (3) for purposes of assessing fees, Plaintiff was considered an educational institution, noncommercial scientific institution or representative of the news media, and if fees were to be assessed, plaintiff would be charged applicable duplication fees in accordance with 5 U.S.C. § 552 (a)(4)(A)(ii)(II). The FBI further advised Plaintiff that the status of its request could be checked on www.fbi.gov/foia and that it may file an appeal, by mail or online with DOJ OIP, within ninety days from the date of the letter. (***See* Exhibit B.**)

(10)     By a second letter, also dated August 5, 2016, attached hereto as Exhibit C, the FBI informed Plaintiff that its request for expedited processing was denied because Plaintiff did not provide enough information to meet the requirement for expedited processing set out in 28 C.F.R. § 16.5 (e)(1)(ii) ("An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."). The FBI further advised Plaintiff of its right to appeal the FBI's decision by submitting an appeal, by mail or online with OIP, within ninety days from the date of the letter.  Finally, the FBI advised Plaintiff it may seek dispute resolution services by contacting the Office of Government Information Services ("OGIS") by telephone or by email at ogis@nara.gov. (*See* **Exhibit C.)**

(11)     By letter dated August 23, 2016, attached hereto as Exhibit D, the FBI informed Plaintiff that, upon further review of Plaintiff's request for expedited processing it was determined Plaintiff provided enough information to meet the standard for expedited processing set out in 28 C.F.R. § 16.5 (e)(1)(iv) ("A matter of widespread and exceptional media interest in which their exist possible questions about the government's integrity which affect public confidence.").  Thus, Plaintiff's request for expedited processing was approved.  The FBI further advised Plaintiff of its right to appeal the FBI's decision by submitting an appeal, by mail or online with the OIP, within ninety days from the date of the letter.  Finally, the FBI advised Plaintiff it may seek dispute resolution services by contacting OGIS by telephone or by email at ogis@nara.gov. (*See* **Exhibit D.)**

(12)     By letter dated October 21, 2016, attached hereto as Exhibit E, the FBI advised Plaintiff no records responsive to its request were located.  The FBI further advised Plaintiff of its right to appeal the FBI's decision by submitting an appeal, by mail or online with the OIP,

within ninety days from the date of the letter.  Finally, the FBI advised Plaintiff it may seek dispute resolution services by contacting OGIS by telephone or by email at ogis@nara.gov.  (*See* **Exhibit E.**)

(13)    By letter dated August 10, 2017, attached hereto as Exhibit F, the FBI advised Plaintiff of a change in status of Plaintiff's request to the FBI.  Specifically, the FBI advised that subsequent to its no record response to Plaintiff dated October 21, 2016, DOJ OIP forwarded communications it located through its search on the identical request to FBI for consultation, and the FBI identified a limited number of privacy redactions (Exemptions 6 and 7(C)) to protect the identities of FBI personnel contained within these communications.  As a result, the FBI advised (1) it determined records potentially responsive to Plaintiff's request may exist; (2) Plaintiff's request was reopened as FOIPA Request No. 1355324-001; and (3) a search for responsive material was being performed.  Finally, the FBI advised Plaintiff to check the status of its FOIA request via www.fbi.gov/foia website under "Contact Us."  (*See* **Exhibit F.**)

(14)    On September 11, 2017, emails were exchanged between the FBI's Public Information Officer ("PIO"), and Colby May, counsel for Plaintiff, his colleague Carly F. Gammill, and other copied recipients at Plaintiff's office.  The initial email from Mr. May notified the FBI's PIO that he authorized her to communicate directly with his colleague Ms. Gammill concerning FOIPA Request No. 1355324-001.  The second email from the FBI's PIO advised Ms. Gammill that she attempted to return her call at the number provided and received a message indicating it was not a valid extension, and asked if there was another number where she should be contacted.  The third email from Ms. Gammill to the FBI's PIO stated that the latter had confirmed that the initial grant of expedited processing would be applied to the re-opened request.  The fourth and final email from the FBI's PIO advised Ms. Gammill that once

expedited processing is approved, the Record/Information Dissemination Section processes the request "as soon as practicable." (*See* **Exhibit G.**)

(15)    The next day, September 12, 2017, Plaintiff filed its complaint in the instant action. (*See* **ECF Docket Number 1.**)

(16)    By letter dated November 30, 2017, attached hereto as Exhibit H, the FBI made a first and final release of records to Plaintiff. The FBI advised 29 pages of records were reviewed and 29 pages of records were being released in full or in part. Information was withheld pursuant to FOIA Exemptions (b)(5), (b)(6), and (b)(7)(C). Plaintiff was also advised DOJ OIP made the deletions and to appeal those denials, Plaintiff would need to write directly to DOJ OIP. Finally, the FBI advised Plaintiff that the records were being provided at no charge because the page total did not incur a fee and thus it was unnecessary to adjudicate Plaintiff's request for a fee waiver. (*See* **Exhibit H.**)

## THE SEARCHES FOR RESPONSIVE RECORDS

(17)    The FBI's general practice is to search its Central Records System ("CRS") to determine if the FBI has records about particular investigative subjects in response to most FOIA requests. The FBI ordinarily relies on the CRS because it is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency. In the CRS, FBI employees record index terms in files that are useful to a particular investigation or that are deemed potentially useful for future investigative/intelligence retrieval purposes, such as names of individuals, organizations, companies, publications, activities, or foreign intelligence matters (or programs); they do not index every individual name or other subject matter in the general indices. To locate information indexed in files in the CRS, RIDS employs an index search

indices.  To locate information indexed in files in the CRS, RIDS employs an index search methodology.

(18)    An index search of the CRS for investigative records, is reasonably expected to locate responsive material within the vast CRS since the FBI indexes pertinent information into the CRS to facilitate retrieval based on operational necessity.  For the request at issue in this case, a search of the CRS would not be reasonably likely to locate responsive records in light of the purpose, design and organization of the CRS, the manner in which the records of the CRS are indexed, and the nature of the requested records.  The search terms "Clinton" and "Lynch" (and any variations thereof) are unlikely to be indexed as either subjects of investigation within the CRS's indices and thus a typical index search of the CRS would be unlikely to yield the specifically requested records.

(19)    Since a search of the CRS does not lend itself readily or naturally to a search for records responsive to Plaintiff's request, RIDS determined it needed to conduct searches outside of the CRS indices.  The Attorney General and FBI Director are presidentially designated as required use travelers for all of their travel and travel aboard DOJ or other government aircraft.  Thus, RIDS contacted personnel in the FBI's Security Division, Critical Incident Response Group ("CIRG"), and Operational Technology Division ("OTD") seeking records responsive to Plaintiff's request.  The Security Division was selected as it is responsible for the Attorney General's Protective Detail.  The CIRG and OTD were selected because they are responsible for any secure communication systems onboard FBI aircraft.  These searches resulted in no records being located.

(20)    RIDS did not conduct a search of its unclassified and classified email systems because Plaintiff's did not provide the names of FBI custodians who may have either sent emails

or received emails concerning the meeting between Attorney General Lynch and former President Bill Clinton on June 27, 2016.

(21)    After receiving a consultation request from DOJ OIP on or about May 23, 2017, however, the FBI examined the records provided by DOJ OIP and used the information contained therein to conduct a search of its unclassified and classified email systems. Specifically, on or about September 12, 2017, the FBI searched electronic communications of FBI custodians identified in the records (some of whose names were redacted) using the following search terms: "Lynch AND tarmac;" "Clinton AND tarmac;" "Lynch AND Phoenix;" "Clinton and Phoenix;" and "Tarmac meeting." The date range was restricted to records created between June 13, 2016 and August 9, 2016. This search yielded responsive records. Accordingly, the FBI has determined that beyond those locations that have been searched, there is no other location or record system likely to contain responsive documents.

## JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

*A.    FBI - Explanation of the Coded Format Used to Describe and Justify Withholdings*

(22)    All documents responsive to Plaintiff's request and subject to the FOIA were processed to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiff with all material in the public domain and with all reasonably segregable non-exempt information in the responsive records. No reasonably segregable, non-exempt portions have been withheld from Plaintiff. Further description of the information withheld, beyond what is provided in this declaration, could identify the actual exempt information that the FBI has protected. Copies of the pages released in part and in full have been consecutively numbered "FBI - 1 through FBI - 29" at the bottom of each page. *See* Ex. H. The exemptions asserted by the FBI as grounds for non-disclosure of portions of documents are FOIA exemptions 6 and 7(C), 5 U.S.C. § 552 (b)(6), (b)(7)(C).

(23)     The Bates-numbered documents contain, on their face, coded categories of exemptions that detail the nature of the information withheld pursuant to the provisions of the FOIA.  The coded categories are provided to aid the Court's and Plaintiff's review of the FBI's explanation of the FOIA exemptions it asserted to withhold material.  The coded, Bates numbered pages together with this declaration demonstrate that all material withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

(24)     Each instance of information withheld on the Bates-numbered documents is accompanied by a coded designation that corresponds to the categories listed below.  For example, if (b)(7)(C)-1 appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption (7)(C) protecting against unwarranted invasions of personal privacy.  The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into a more specific subcategory, such as "Names and/or Identifying Information of FBI Special Agents/Support Personnel."

(25)     Listed below are the categories used to explain the FOIA exemptions asserted to withhold the protected material:

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Exemption (b)(6) and Exemption (b)(7)(C)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and/or Identifying Information of FBI Special Agents and Support Personnel |
| (b)(6)-2 and (b)(7)(C)-2 | Names and/or Identifying Information of Third Parties Merely Mentioned |

## EXEMPTION 7 THRESHOLD

(26)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Pursuant to 28 U.S.C. §§ 553, 534 and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic Operations ("AGG-DOM") and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.  Under this investigative authority, portions of the responsive records herein were compiled for law enforcement purposes; they squarely fall within the law enforcement duties of the FBI; therefore, the information readily meets the threshold requirement of Exemption (b)(7).

## EXEMPTIONS 6 AND 7(C)

(27)   Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  All information that applies to a particular person falls within the scope of Exemption 6.

(28)   Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[2]

(29)   When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure.  In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue.  When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure.  For purposes of these exemptions, a public interest exists only when information about an individual would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.  In each instance where

---

[2] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion.  The privacy interests are balanced against the public's interest in disclosure under both exemptions.

information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the

individuals' privacy interests outweighed any public interest in disclosure.

### (b)(6)-1 and (b)(7)(C)-1     Names and/or Identifying Information of FBI Special Agents and Support Personnel

(30)     In Categories (b)(6)-1 and (b)(7)(C)-1, the FBI protected the names, identifying

information, email addresses and, at times, telephone numbers of FBI Special Agents ("SAs")

and support personnel who were responsible for receiving, reviewing, analyzing, supervising,

and/or conducting the day-to-day operations of the FBI reflected in the responsive documents.

FBI SAs and support personnel, attorneys and paralegals have access to information regarding

official law enforcement investigations, and therefore may become targets of harassing inquires

for unauthorized access to information regarding such investigations if their identities were

released.  Assignments of SAs, support personnel, attorneys and paralegals to any particular

matter or investigation are not by choice.  Publicity (adverse or otherwise) regarding a specific

investigation to which they have been assigned may seriously prejudice their effectiveness in

conducting other investigations.  The privacy consideration is also to protect FBI SAs, support

personnel, attorneys and paralegals as individuals, from unnecessary, unofficial questioning as to

their assistance rendered in matters such as described in the processed records, or their conduct

in other investigations and/or legal matters, whether or not they are currently employed by the

FBI.  For example, an individual targeted by such law enforcement actions may carry a grudge.

Such individuals may seek revenge on the agents, support personnel, attorneys and/or paralegals

involved in a particular investigation or legal matter.  Thus, the FBI employees maintain

substantial privacy interests in not having their identities disclosed.  In contrast, there is no

public interest to be served by disclosing the identities of the SAs, support personnel, attorneys

and/or paralegals to the general public because their identities would not significantly increase the public's understanding of the FBI's operations and activities.

(31)    Accordingly, the FBI protects the names and identifying information of all lower ranking personnel in all FBI records, including records compiled for reasons other than law enforcement, pursuant to FOIA Exemption 6.

(32)    First, there is no public interest in the release of this specific information because release of the names and identifying information of lower ranking FBI personnel does not shed light on government operations.  Second, there are cognizable privacy interests connected to the release of FBI employee names and identifying information regardless of the specific position held, e.g., a Special Agent, Intelligence Analyst, or Professional Staff/Support employee.  As a law enforcement and intelligence agency with myriad missions including counterterrorism, counterintelligence, and cybercrime, mere employment with the FBI – and the access to classified information that it provides – puts all FBI employees at risk of clearly unwarranted invasions of privacy.

(33)    Additionally, all FBI employees possess Top Secret clearances allowing access to classified material and systems, including Sentinel, the FBI's electronic, "next generation" case management system where sensitive criminal and national security investigative information is stored.  Positive identification as an FBI employee is of genuine interest to criminal elements, terrorists, and foreign intelligence services.  As a result, the FBI routinely protects the names and identifying information of all lower ranking employees as their status of an FBI employee, on its own, may subject them to harassment by criminals seeking access to FBI information or retribution, violent acts of terrorists who advocate bodily harm against U.S. law enforcement and military personnel in furtherance of ideology, or recruitment by foreign agents intent on

espionage.  As such, FBI support employees have identifiable privacy interests in protection

from the harms above as well as unnecessary, unofficial questioning as to the conduct of

investigations or the law enforcement activities they support.

(34)    Moreover, these identifiable harms are not confined to FBI occupation and do not

turn on whether or not the FBI records disclosing the identifying employee information was

compiled for a law enforcement purpose.  Adversaries who pose harm to the FBI are not required

to draw distinctions between FBI employees based on occupation or the reason an FBI record

was compiled--the key piece of information is identifying the individual as a member of the

FBI.  For instance, a foreign intelligence agent seeking to recruit an FBI employee might pursue

an opportunity to turn a support employee to try to get access to classified information.

(35)    Finally, applying the balance of interests, the identifiable FBI employee privacy

interests articulated above outweigh the lack of any public interest in disclosure demonstrating

how government works, thus triggering a clearly unwarranted invasion of privacy with

reasonably foreseeable harm to those privacy interests.  Accordingly, the FBI properly withheld

their names and identifying information pursuant to Exemptions 6 and 7(C).[3]

### (b)(6)-2 and (b)(7)(C)-2     Names and/or Identifying Information of Third Parties Merely Mentioned

(36)    In Categories (b)(6)-2 and (b)(7)(C)-2, the FBI protected the names and

identifying information (specifically, email address and/or a cellular telephone number) of third

parties who were merely mentioned in the records responsive to Plaintiff's request.  These

individuals were not of investigative interest to the FBI.  These third parties maintain substantial

and legitimate privacy interests in not having this information disclosed.  Disclosure of the third

---

[3] Exemptions (b)(6)-1, (b)(7)(C)-1 or both have been asserted to withhold FBI information on Bates Numbered pages: FBI-1, 2, 4, 7, 12, 14-23, 25, and 27.

parties' names and identifying information in connection with an FBI matter carries an extremely negative connotation. Disclosure of their identities might subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. The FBI then considered whether there was any public interest that would override these privacy interests, and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly protected these individuals' privacy interests pursuant to FOIA Exemptions 6 and 7(C).[4]

**B.** *Justification of Withholdings per DOJ OIP*

<u>Exemption (b)(5)</u>

(37)     Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). As discussed in detail below, the information protected by OIP pursuant to FOIA Exemption 5 falls squarely within the deliberative process privilege.[5]

Exemption 5: Inter-/Intra-Agency Threshold

(38)     Inter- and intra-agency communications may be withheld from release pursuant to Exemption 5 of the FOIA. Here, the information withheld from Plaintiff pursuant to this exemption consists of internal Department communications about responding to media and related inquiries concerning the June 27, 2016 meeting. Specifically, proposed or draft talking points for potential use in responding to inquiries about the meeting and related topics. All of

---

[4]  Exemptions (b)(6)-2, (b)(7)(C)-2 or both have been asserted to withhold FBI information on Bates Numbered pages: FBI-14, 15, and 22.

[5]  Exemption (b)(5) has been asserted by DOJ OIP to withhold information on Bates Numbered pages: FBI-2, 3, 23, and 24.

these records were generated by, exchanged within, and remained wholly internal to the Department of Justice. As such, they are "inter-/intra-agency" records within the threshold of FOIA Exemption 5.

<u>Exemption 5: Deliberative Process Privilege</u>

(39)    The deliberative process privilege is intended to protect the decision-making processes of government agencies from public scrutiny in order to enhance the quality of agency decisions. If pre-decisional, deliberative communications are routinely released to the public, Department employees will be much more cautious in their discussions with each other and in providing all pertinent information and viewpoints to agency decision-makers in a timely manner. This lack of candor would seriously impair the Department's ability to foster the forthright, internal discussions necessary for efficient and proper decision-making.

(40)    The challenged portions of intra-agency e-mails withheld in this case by OIP consist of strategic discussions regarding Departmental considerations in responding to media and related inquiries concerning the June 27, 2016 meeting. As stated above, the withholdings of proposed or draft talking points for potential use in responding to inquiries about the meeting and related topics. All of the information withheld by OIP pursuant to the deliberative process privilege is pre-decisional inasmuch as it was drafted before and in preparation for communications with the press and public.

(41)    The portions of e-mail discussions regarding press coverage withheld by OIP are deliberative, pre-decisional Department communications. These e-mails evaluate and analyze press coverage and make recommendations and/or consider possible options in responding to press and other inquiries. As part of the exchange of ideas and suggestions that accompanies all agency decision-making, these e-mails reflect preliminary assessments in which various agency

stakeholders strategize, opine, advise, and discuss working matters under their purview. Such e-mails most resemble conversations among staff members which are part of the give and take of agency deliberations. Disclosure of preliminary assessments, recommendations, and opinions like those withheld in this case would make individuals feel they could not candidly present their ideas and advice on Department activities or make suggestions on how to respond to press inquiries, which would in turn severely hamper the efficient daily workings of the Department and, in particular, the Department's ability to engage effectively and accurately with the press. Agency decision-making is at its best when employees are able to focus on the substance of their views and not on how those views would appear if they were later made public.

(42)     The draft or proposed talking points, as well as the e-mails concerning them, are also deliberative and pre-decisional. Drafting and preparing talking points and statements for possible use by Department personnel is a critical aspect of the decision-making process. In this case, none of the withheld materials were released in final format by the Department.

(43)     Talking points prepare Department officials to address various questions that may arise during the course of anticipated meetings, official travel, public interactions, and engagement with the press. The drafters of these talking points also attempted to succinctly summarize particular events, identify important issues, and provide key background information in a concise summary format for ease of understanding and presentation. Throughout this process, the authors necessarily review the universe of facts and possible issues arising on the topic at hand and then select those facts and issues that they deem most appropriate for briefing agency decision-makers. Authors attempt to anticipate questions that senior leadership, including the Attorney General, may encounter in an effort to ensure that they are prepared to respond to questions and offer varying options for how to respond to different inquiries. The

decision to include or exclude certain factual information in or from analytical material is itself an important part of the deliberative process.

(44)     Talking points, such as those withheld by OIP here, reflect the drafters' opinions and analyses on specific topics and focus on how best to convey and respond to questions on these topics from the Department's perspective.  Revealing such opinions and analyses would hinder Department staff's ability to provide candid evaluations, as well as prepare Department leadership to prepare for press events and to provide informed and accurate responses to potential questions they receive.  Moreover, because the selection of facts and source material is itself a part of the deliberative process inherent to preparation of talking points, these documents are protected in full pursuant to FOIA Exemption 5.

### Exemption (b)(6)

(45)     When determining whether to withhold information pursuant to Exemption 6, OIP balances the privacy interests of individuals identified in the records against any "FOIA public interest" in disclosure of that information.  In making this analysis, the FOIA public interest considered is limited to information which would shed light on the Department's performance of its mission:  to enforce the law and defend the interests of the United States according to the law; to ensure public safety against threats foreign and domestic; to provide federal leadership in preventing and controlling crime; to seek just punishment for those guilty of unlawful behavior; and to ensure fair and impartial administration of justice of all Americans.

(46)     Plaintiff has challenged OIP's withholding, pursuant to Exemption 6, of the cellular telephone numbers of government employees and of an email address of a third party.  OIP found, in light of the Department's mission, that there was no FOIA public interest served by the release of such information and that there were individuals who had privacy interests that

21

would be impaired by the release of such information.  The release of the cellular telephone numbers of DOJ employees would also not aid the public's understanding of how the Department carries out its duties.  In the absence of any public interest to weigh against the privacy interest served by protecting this information from the release under Exemption 6, OIP withheld cellular telephone numbers of government officials pursuant to Exemption 6.[6]

**Personal Contact Information**

(47)    In each instance where information was withheld from Plaintiff pursuant to Exemption 6, OIP determined that the individual's privacy interests were not outweighed by any FOIA public interest in disclosure of that information.  Given the personal nature of an individual's mobile device, which by its very nature is routinely carried on one's person when he or she is physically out of the office, at home, and/or on personal time, there is a greater potential for invasion of privacy in the disclosure of such cellphone numbers than there is in an individual's office telephone number.  The release of such information could subject those employees to unwarranted harassment in their personal time and personal lives, and as such the release of such information would "constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6).  Cellular telephone numbers that appeared in Bates numbered pages FBI-3, 12, 13, and 24, were withheld from release by OIP pursuant to Exemption 6.

(48)    Additionally, OIP withheld from Plaintiff, an email address of a third party that appeared in Bates numbered page FBI-13 based on the same reasoning as set forth by the FBI in ¶ 36, *supra*.[7]

---

[6] Exemption (b)(6) has been asserted by DOJ OIP to withhold cellular telephone numbers on Bates Numbered page:  FBI-3, 12, 13 and 24.
[7] Exemption (b)(6) has been asserted by DOJ OIP to withhold a third party email address on Bates Numbered page:  FBI-13.

## CONSULT AND/OR REFERRAL

(49)     While processing records responsive to Plaintiff's request, the FBI identified

information which either originated with or contained another government agency's information

and/or equities.  Pursuant to established DOJ procedures, the FBI consulted with this agency,

DOJ OIP, and asked it to make disclosure determinations concerning its information.

(50)     The FBI identified three documents (Bates-numbered "FBI-2 through FBI-3,"

"FBI-12 through FBI-13," and "FBI-23 through FBI-24") which either originated with or

contained OIP's information and/or equities.  Following consultations between OIP and FBI, it

was determined that certain information contained in these documents was exempt from

disclosure pursuant to Exemptions (b)(5) and (b)(6).  The FBI protected this information for the

reasons discussed in ¶¶ 36-48, *supra*.

## SEGREGABILITY

(51)     Plaintiff has been provided all responsive non-exempt records or portions of

records responsive to its FOIA request to the FBI.  During the processing of Plaintiff's request,

each responsive page was individually examined to identify non-exempt information that could

be reasonably segregated from exempt information for release.  All segregable information has

been released to Plaintiff.  As demonstrated herein, the only information withheld by the FBI

consists of information that would trigger reasonably foreseeable harm to one or more interests

protected by the cited FOIA exemptions.

(52)     As previously mentioned *supra* in paragraph 4, twenty-nine responsive pages

were identified:  nine pages were Released in Full ("RIF") and twenty pages were Released in

Part ("RIP").  Each of these categories is discussed below to further address segregability.

(a)     Pages RIF.  Following the segregability review, RIDS determined nine pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption.

(b)     Pages RIP.  RIDS further determined, in some instances after consultation with other agencies, that twenty pages could be released in part with certain redactions, as discussed above.  These pages consist of a mixture of information that could be segregated for release and information that was withheld because its release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on those pages.

## CONCLUSION

(53)     The FBI performed an adequate and reasonable search for records responsive to Plaintiff's FOIA request in the places reasonably likely to have responsive records.  The FBI has processed (at times, with the assistance of other agencies) responsive records under the access provisions of the FOIA to provide maximum disclosure; and has released all reasonably segregable non-exemption information to Plaintiff.  The FBI properly exempted information pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. § 552 (b)(6), (b)(7)(C).  The FBI carefully examined the responsive documents and determined that the information withheld from Plaintiff, if disclosed, would cause a clearly unwarranted invasion of personal privacy and could reasonably be expected to constitute an unwarranted invasion of personal privacy.  Accordingly, the FBI has released all reasonably segregable, non-exempt information to Plaintiff in response to its FOIA request to the FBI.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A - H attached hereto are true and correct copies.

Executed this ⏟ day of February, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CENTER FOR LAW
AND JUSTICE

    Plaintiff,

        v.

UNITED STATES DEPARTMENT OF
JUSTICE,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. A. No. 1:17-cv-01866

# EXHIBIT A



**ACLJ**

**American Center**
*for* **Law & Justice**

★

*Jay Alan Sekulow, J.D., Ph.D.*
*Chief Counsel*

July 15, 2016

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
170 Marcel Drive
Winchester, VA 22602-4843
Phone: (540) 868-4500
Fax: (540) 868-4997

**RE:** **FOIA Request to U.S. Department of Justice and Federal Bureau of Investigation Regarding Attorney General Loretta Lynch's June 27, 2016, Meeting With Bill Clinton**

Dear Mr. Hardy:

This letter is a request ("Request") in accordance with the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the corresponding department/agency implementing regulations.

The Request is made by the American Center for Law and Justice ("ACLJ")[1] on behalf of itself and over 80,000 of its members. The ACLJ respectfully seeks expedited processing and a waiver of fees related to this Request as set forth in an accompanying memorandum.

To summarize, this Request seeks any and all records pertaining to Attorney General Loretta Lynch's meeting with former President Bill Clinton on June 27, 2016, which occurred on her airplane at the Sky Harbor International Airport in Phoenix, Arizona.

<u>**Background**</u>

Pursuant to DOJ FOIA regulation 28 C.F.R. §16.3(b), this Background addresses "the date, title or name, author, recipient, subject matter of the record[s]" requested, to the extent known.

---

[1] The ACLJ is a not-for-profit 501(c)(3) organization dedicated to the defense of constitutional liberties secured by law. The ACLJ regularly monitors governmental activity and works to inform the public of such affairs. The ACLJ and its global affiliated organizations are committed to ensuring governmental accountability and the ongoing viability of freedom and liberty in the United States and around the world.

★

*201 Maryland Avenue, N.E.*
*Washington, DC 20002*
*202-546-8890*

As is being covered extensively by the press, Attorney General Loretta Lynch and former President Bill Clinton met on General Lynch's private airplane on Monday, June 27, 2016, on the tarmac at Sky Harbor International Airport in Phoenix, Arizona.

According to CNN's report, "Lynch and Bill Clinton met privately in Phoenix Monday after the two realized they were on the same tarmac, an aide to the former president said.[2] But according to other reports, "Clinton was reportedly notified that Lynch would be landing in Phoenix soon and waited in order to meet her."[3] Reportedly, "[t]he former president then walked over to the attorney general's plane to speak to Ms. Lynch and her husband."[4] As reported by The Hill, "[a] law enforcement official familiar with the matter told CNN that Lynch's FBI security detail did not stop Clinton when he moved to initiate the extended conversation."[5] "The entire meeting lasted about 30 minutes."[6] CNN quoted General Lynch as describing the conversation as "*primarily* social."[7]

*This matter is of grave importance to the public.* General Lynch is the head of the Department of Justice — and the nation's chief law enforcement officer. As recognized by a United States District Judge[8] and the White House[9], the DOJ was, at the time of the meeting at issue, engaged in a "criminal investigation" of Hillary Clinton, Bill Clinton's wife, former Secretary of State and now leading Democratic presidential candidate, with respect to her use and deletion of emails. At the time of the meeting, the DOJ itself had described the investigation as a "law enforcement matter."[10]

---

[2] Eli Watkins, *Bill Clinton Meeting Causes Headaches for Hillary*, CNN.COM (Jun. 20, 2016, 9:26 PM), http://www.cnn.com/2016/06/29/politics/bill-clinton-loretta-lynch/.

[3] Alex Griswold, *Loretta Lynch Privately Meets with Bill Clinton Aboard Personal Plane*, MEDIAITE.COM (Jun. 29, 2016, 1:22 PM), http://www.mediaite.com/tv/loretta-lynch-privately-meets-with-bill-clinton-aboard-personal-plane/.

[4] *Attorney General Lynch has Private Meeting with Bill Clinton*, FOXNEWS.COM (Jun. 29, 2016), http://www.foxnews.com/politics/2016/06/29/attorney-general-lynch-meets-with-bill-clinton-privately.html.

[5] Jesse Byrnes, *Lynch Meeting with Bill Clinton Creates Firestorm for Email Case*, THEHILL.COM (Jun. 30, 2016, 1:56 PM), http://thehill.com/policy/national-security/286143-lynch-clinton-meeting-creates-firestorm.

[6] Griswold, *supra* note 3; Geoff Earle, *Loretta Lynch Held Private Talks with Bill Clinton Aboard a Plane in Phoenix while Her Department Investigates Hillary*, DAILYMAIL.CO.UK (Jun. 29, 2016, 6:03 PM), http://www.dailymail.co.uk/news/article-3666856/Loretta-Lynch-held-private-talks-Bill-Clinton-aboard-plane-Phoenix-department-investigates-Hillary.html.

[7] Watkins, *supra* note 2(emphasis added).

[8] Josh Gerstein, *Judge Links Clinton Aide's Immunity to 'Criminal Investigation'*, POLITICO.COM (Jun. 14, 2016, 11:46 AM), http://www.politico.com/story/2016/06/hillary-clinton-judge-investigation-224314; Stephen Dinan, *Judge Confirms 'Criminal Investigation' into Clinton Emails*, WASHINGTONTIMES.COM (Jun. 14, 2016), http://www.washingtontimes.com/news/2016/jun/14/judge-confirms-criminal-probe-clinton-emails/.

[9] *White House Confirms 'Criminal' Probe over Clinton Emails, 'Shreds' Campaign Claim*, FOXNEWS.COM (Jun. 10, 2016), http://www.foxnews.com/politics/2016/06/10/white-house-confirms-criminal-probe-over-clinton-emails-shreds-campaign-claim.html.

[10] *DOJ Acknowledges Hillary Email Investigation is a 'Law Enforcement Matter'*, INSIDER.FOXNEWS.COM (May 2, 2016), http://insider.foxnews.com/2016/05/02/judge-napolitano-new-developments-hillary-clinton-email-investigation-justice-department.

According to Sen. Chris Coons (D-Del.), "it doesn't send the right signal."[11] Indeed, both the meeting and the "personal or political relationship," 5 C.F.R. § 45.2, evidenced by the meeting and affirmed by General Lynch in her comments after the meeting implicate Federal Regulations and DOJ Standards of Conduct.[12]

Less than a week after the meeting occurred on General Lynch's airplane, it was reported that the FBI interviewed Hillary Clinton on Saturday, July 2, 2016, over the July 4th weekend.[13] Then, on Tuesday, July 5, 2016, FBI Director James Comey announced the FBI was not recommending that Hillary Clinton be prosecuted "for her handling of classified documents and sensitive information, which she conducted on a private email server during her time as secretary of state."[14] On July 6, 2016, General Lynch announced: "I received and accepted their unanimous recommendation that the thorough, year-long investigation be closed and that no charges be brought against any individuals within the scope of the investigation."[15] Thus, the criminal investigation is over.

### Records Requested

For purposes of this Request, the term "record" is "any information" that qualifies under 5 U.S.C. § 552(f), and includes, but is not limited to, the original or any full, complete and unedited copy of any log, chart, list, memorandum, note, correspondence, writing of any kind, policy, procedure, guideline, agenda, handout, report, transcript, set of minutes or notes, video, photo, audio recordings, or other material. The term "record" also includes, but is not limited to, all relevant information created, stored, received or delivered in any electronic or digital format, e.g., electronic mail, instant messaging or Facebook Messenger, iMessage, text messages or any other means of communication, and any information generated, sent, received, reviewed, stored or located on a government *or private* account or server, consistent with the holdings of *Competitive Enterprise Institute v. Office of Science and Technology Policy*, No. 15-5128 (D.C. Cir. July 5, 2016)[16] (rejecting agency argument that emails on private email account were not under agency control, and holding, "If a department head can deprive the citizens of their right to know what his department is up to by the simple expedient of maintaining his departmental emails on an account in another domain, that purpose is hardly served.").

---

[11]Byrnes, *supra* note 5.
[12] Moreover, the press has highlighted the fact that "[t]he encounter took place ahead of the public release Tuesday morning of the House Benghazi Committee's report on the 2012 attack on a U.S. consulate in Libya." Watkins, *supra* note 2 . According to one source, the "meeting" "occurred just hours before" the Benghazi Committee's report's release. Earle, *supra* note 6.
[13]Byron Tau, *Hillary Clinton Interviewed by FBI in Email Probe*, WSJ.COM (Jul. 2, 2016, 7:39 PM), http://www.wsj.com/articles/hillary-clinton-interviewed-by-fbi-1467478221.
[14]Gregory Krieg, *FBI Boss Comey's 7 Most Damning Lines on Clinton*, CNN.COM (Jul. 5, 2016, 6:05 PM), http://www.cnn.com/2016/07/05/politics/fbi-clinton-email-server-comey-damning-lines/.
[15]Eric Bradner, *AG Loretta Lynch Declines to Press Charges Against Clinton*, CNN.COM (Jul. 6, 2016, 8:13 PM), http://www.cnn.com/2016/07/06/politics/loretta-lynch-hillary-clinton-emails-no-charges/.
[16]https://www.cadc.uscourts.gov/internet/opinions.nsf/75450CA390CB52C985257FE7005038BD/$file/15-5128-1622973.pdf.

For purposes of this Request, the term "briefing" includes, but is not limited to, any in-person meeting, teleconference, electronic communication, or other means of gathering or communicating by which information was conveyed to one or more person.

For purposes of this Request, the term "DOJ official" includes, but is not limited to, any person who is (1) employed by or on behalf of the U.S. Department of Justice or Federal Bureau of Investigation in any capacity; (2) contracted for services by or on behalf of the U.S. Department of Justice or Federal Bureau of Investigation in any capacity; or (3) appointed by the President of the United States to serve in any capacity at the U.S. Department of Justice or Federal Bureau of Investigation, all without regard to the component or office in which that person serves.

For purposes of this Request, and unless otherwise indicated, the timeframe of records requested herein is June 13, 2016, to the date this Request is processed.

Pursuant to FOIA, 5 U.S.C. § 552 *et seq.*, ACLJ hereby requests that the U.S. Department of Justice produce the following within twenty (20) business days:

*Records Regarding Names of DOJ Officials Involved in Meeting-Related Discussions or Decisions*

1.      Any and all records containing the names of any DOJ official, staff or employee who participated in any discussion regarding the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

2.      Any and all records containing the names of any DOJ official, staff or employee who participated in any decision on or determination of whether clearance, authorization or permission should be granted or in fact would be granted to Bill Clinton to board General Lynch's airplane on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

3.      Any and all records containing the names of any person present in the passenger compartment of General Lynch's airplane during the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

*Records Regarding Meeting-Related Discussions or Decision*

4.      Any and all records, communications or briefings prepared, sent, received or reviewed by General Lynch or any other DOJ official, staff or employee, *before* the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona, containing any discussion of or in any way regarding the meeting.

5.       Any and all records, communications or briefings prepared, sent, received or reviewed by General Lynch or any other DOJ official, staff or employee, *at any time*, containing any discussion of or in any way regarding the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

6.       Any and all records prepared, sent, received or reviewed by General Lynch or any other DOJ official, staff or employee, at any time, containing any discussion of or in any way regarding the decision to grant clearance, authorization or permission to Bill Clinton to board General Lynch's airplane on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona.

### *Records Regarding Communications Received From Bill Clinton or Regarding His Presence*

7.       Any and all records of any communication or briefing received by General Lynch, any DOJ official, staff or employee from Bill Clinton or his staff regarding the meeting between General Lynch and Bill Clinton that occurred on Monday, June 27, 2016, at Sky Harbor International Airport in Phoenix, Arizona, *regardless of whether the communication or briefing was received before, during, or after the meeting.*

8.       Any and all records of any communication or briefings by which General Lynch was advised that Bill Clinton was present at the Sky Harbor International Airport in Phoenix, Arizona, on Monday, June 27, 2016.

### *Records Regarding Any Discussion of Bill Clinton*

9.       Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee or any other person *from June 13, 2016 to Sunday, June 26, 2016*, containing any discussion of or in any way naming, regarding, involving or referencing Bill Clinton.

10.      Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee on Monday, June 27, 2016, containing any discussion of or in any way naming, regarding, involving or referencing Bill Clinton, regardless of whether the communication or briefing was prepared or sent before, during or after the meeting between General Lynch and Bill Clinton.

11.      Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee on Tuesday, June 28, 2016, *or after*, containing any discussion of or in any way naming, regarding, involving or referencing Bill Clinton.

***Records Regarding Discussion of Ethics Rules or Professional Codes of Conduct Governing Attorneys***

12.     Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *before* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any discussion of ethics rules or DOJ Standards of Conduct governing attorneys in connection with the meeting *or* Lynch's relationship with Bill Clinton.

13.     Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *after* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any discussion of ethics rules or DOJ Standards of Conduct governing attorneys in connection with the meeting *or* Lynch's relationship with Bill Clinton.

14.     Any and all records, communications or briefings prepared, sent, received or reviewed by General Lynch, her staff, any DOJ official or employee, regarding or containing any discussion of the contents or requirements of 5 C.F.R. § 45.2 in connection with the meeting *or* Lynch's relationship with Bill Clinton..

***Records Regarding Discussion of or Decisions on Response to Press***

15.     Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *after* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any *discussion of the press, responding to the press, or the content of any press release or public statements* in connection with the meeting.

16.     Any and all records of any communication or briefing prepared, sent, received or reviewed by General Lynch, her staff, or any other DOJ official or employee *after* the meeting on Monday, June 27, 2016, between General Lynch and Bill Clinton at Sky Harbor International Airport in Phoenix, Arizona, containing any *decision regarding the press, responding to the press, or the content of any press release or public statements* in connection with the meeting.

## CONCLUSION

As you are undoubtedly aware, President Obama's Freedom of Information Act Memorandum of January 21, 2009, declares:

> A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, "sunlight is said to be the best of disinfectants." In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a

profound national commitment to ensuring an open Government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government.  The presumption of disclosure should be applied to all decisions involving FOIA.[17]

As such, if this Request is denied in whole or in part, ACLJ requests that, within the time requirements imposed by FOIA, you support all denials by reference to specific FOIA exemptions and provide any judicially required explanatory information, including but not limited to, a *Vaughn* Index.

Moreover, as explained in an accompanying memorandum, the ACLJ is entitled to expedited processing of this Request as well as a waiver of all fees associated with it. ACLJ reserves the right to appeal a decision to withhold any information sought by this request and/or to deny the separate application for expedited processing and waiver of fees.

Thank you for your prompt consideration of this Request. Please furnish all applicable records and direct any responses to:

Jay Alan Sekulow, Chief Counsel  
Colby M. May, Senior Counsel  
Craig L. Parshall, Special Counsel  
Benjamin P. Sisney, Senior Litigation Counsel  
American Center for Law and Justice  
201 Maryland Ave., NE  
Washington, D.C. 20002-5703  
(202) 546-8890  
(202) 546-9309 (fax)

sekulow@aclj.org  
cmmay@aclj-dc.org

---

[17]PRESIDENT BARACK OBAMA, MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES RE: FREEDOM OF INFORMATION ACT (Jan. 21, 2009), *available at* https://www.whitehouse.gov/the_press_office/FreedomofInformationAct.

I affirm that the foregoing request and attached documentation are true and correct to the best of my knowledge and belief.

Respectfully submitted,

Jay Alan Sekulow
Chief Counsel

Colby M. May
Senior Counsel

cc:   FOIA/PA Mail Referral Unit, Department of Justice
      Director of Public Affairs, Office of Public Affairs, Department of Justice

8



**ACLJ**
**American Center**
*for* **Law & Justice**

July 15, 2016

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
170 Marcel Drive
Winchester, VA 22602-4843
Phone: (540) 868-4500
Fax: (540) 868-4997

RE:   **FOIA Request to U.S. Department of Justice and Federal Bureau of Investigation Regarding Attorney General Loretta Lynch's June 27, 2016, Meeting With Bill Clinton**

<u>MEMORANDUM IN SUPPORT OF REQUESTED FEE WAIVER AND EXPEDITED PROCESSING</u>

The American Center for Law and Justice ("ACLJ") respectfully submits this Memorandum for fee waiver and expedited processing in support of its Freedom of Information Act Request ("FOIA") request to the U.S. Department of Justice ("DOJ") and Federal Bureau of Investigation ("FBI").

**I.   FEE WAIVER REQUEST**

The ACLJ is a not-for-profit 501(c)(3) organization dedicated to the defense of constitutional liberties secured by law.  The ACLJ's mission is to educate, promulgate, conciliate, and where necessary, litigate, to ensure that those rights are protected under the law.  The ACLJ regularly monitors governmental activity with respect to governmental accountability.  The ACLJ and its globally affiliated organizations are committed to ensuring the ongoing viability of freedom and liberty in the United States and around the world.  By focusing on U.S. constitutional law, European Union law, and human rights law, the ACLJ and its affiliated organizations are dedicated to the concept that freedom and liberty are universal, God-given, and inalienable rights that must be protected.  Additionally, the ACLJ and its affiliated organizations also support training law students from around the world in order to protect religious liberty and safeguard human rights and dignity.

The ACLJ requests a fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii).  Under this section, fees may be waived or reduced if the requester falls within a category established under § (a)(4)(A)(ii), which includes a "representative of the news media," § (a)(4)(A)(ii)(II), and if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the

*201 Maryland Avenue, N.E.*
*Washington, DC 20002*
*202-546-8890*

JUL 25 2016

commercial interest of the requester," § (a)(4)(A)(iii).  The ACLJ qualifies for a fee waiver as a "representative of the news media," *id.* § (a)(4)(A)(ii)(II), and because the information sought is "not for a commercial purpose," § (a)(4)(A)(iii).  Moreover, the ACLJ intends to widely disseminate the information obtained to the public because as explained in detail *infra*, "it is likely to contribute significantly to the public understanding of the operations or activities of the government," § (a)(4)(A)(iii), agency and actors mentioned in the FOIA request.

A.    **The ACLJ Qualifies as a News Media Representative:**

The ACLJ qualifies as a "representative of the news media," as defined under 5 U.S.C. § 552(a)(4)(A)(ii), because the ACLJ, for the purposes explained above, "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." § 552(a)(4)(A)(ii).  The ACLJ's audience is generally comprised of those interested in our mission and legal activities as described above.  The ACLJ reaches a vast audience through a variety of media outlets, including the Internet (World Wide Web page, www.aclj.org), radio, television, press releases, and direct mailings to our supporters.

For example, the ACLJ's Internet site received an average of 822,000 unique visitors per month in 2015, with 22,000,000 page views.  Our current email list holds 1,050,000 active names (actual list size is 2,340,690).  In 2015, the ACLJ sent 278,000,000 emails.

The ACLJ's radio audience consists of more than 1,150,000 estimated daily listeners on 873 radio stations nationwide, including SiriusXM satellite radio.  Additionally, the ACLJ hosts a weekly television program, *Sekulow*, broadcast on eight networks: Cornerstone Television, Daystar Television Network, AngelOne, KAZQ, TBN, VTN, The Walk TV, and HisChannel.  *See* http://aclj.org/radio-tv/schedule (listing schedule).

The ACLJ also disseminates news and information to over 1,000,000 addresses on its mailing lists.  In 2015, the ACLJ sent 15,000,000 pieces of mail.

Moreover, our Chief Counsel, Jay Sekulow, has regularly appeared on various news and talk show programs to discuss the issues and events important to the ACLJ and its audiences. These include shows on FOX News, MSNBC, CNN, ABC, CBS, and NBC.  In addition to television programs, Jay Sekulow has also appeared on national radio broadcasts.  Beyond broadcast outlets, Jay Sekulow's comments appear regularly in the nation's top newspapers, in print and online editions, including but not limited to the Wall Street Journal, New York Times, Washington Times, Washington Post, L.A. Times, and USA Today.  His comments also appear in major national newswire services that include, but are not limited to, Associated Press, Reuters, and Bloomberg.

B.    **The ACLJ's FOIA Request Meets Fee Waiver Standards Set Forth Under DOJ Regulations Promulgated Under FOIA:**

Under 28 C.F.R. § 16.10(c)(1)(i), "[r]equests made by educational institutions, noncommercial scientific institutions, or representatives of the news media are not subject to

search fees." § 16.10(c)(1)(i). And, "[n]o search fees will be charged for requests by educational institutions (unless the records are sought for a commercial use), noncommercial scientific institutions, or representatives of the news media." § 16.10(d). Moreover:

> Records responsive to a request shall be furnished without charge or at a reduced rate below the rate established under paragraph (c) of this section, where a component determines, based on all available information, that the requester has demonstrated that:
>
> (i) Disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government, and
>
> (ii) Disclosure of the information is not primarily in the commercial interest of the requester.

§ 16.10(k)(1).

The DOJ, in making its determination, considers the following four factors regarding "whether disclosure of the requested information is in the public interest because it is likely to contribute significantly to public understanding of operations or activities of the government":

> (i) The subject of the request must concern identifiable operations or activities of the Federal Government, with a connection that is direct and clear, not remote or attenuated.
>
> (ii) Disclosure of the requested records must be meaningfully informative about government operations or activities in order to be "likely to contribute" to an increased public understanding of those operations or activities. The disclosure of information that already is in the public domain, in either the same or a substantially identical form, would not contribute to such understanding where nothing new would be added to the · public's understanding.
>
> (iii) The disclosure must contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester. A requester's expertise in the subject area as well as the requester's ability and intention to effectively convey information to the public shall be considered. It shall be presumed that a representative of the news media will satisfy this consideration.
>
> (iv) The public's understanding of the subject in question must be enhanced by the disclosure to a significant extent. However, components shall not make

3

value judgments about whether the information at issue is "important" enough to be made public.

§ 16.10(k)(2)(i)-(iv).

Under section 16.10(k)(3), the DOJ, in making its determination, considers the following two factors regarding "whether disclosure of the requested information is primarily in the commercial interest of the requester":

> (i) The existence and magnitude of a commercial interest, i.e., whether the requester has a commercial interest that would be furthered by the requested disclosure; and, if so,

> (ii) The primary interest in disclosure, i.e., whether the magnitude of the identified commercial interest of the requester is sufficiently large, in comparison with the public interest in disclosure, that disclosure is primarily in the commercial interest of the requester.

§ 16.10(k)(3).  As the U.S. Court of Appeals for the D.C. Circuit has noted, "Congress amended FOIA to ensure that it is 'liberally construed in favor of waivers for noncommercial requesters.'" *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (citing *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987) (quoting 132 CONG. REC. 27, 190 (1986) (Sen. Leahy))).

The ACLJ's FOIA request meets the DOJ's factors as listed above, qualifying the ACLJ for a waiver of fees, as set forth below.

### § 16.10(k)(2)(i):  The subject of the request concerns identifiable operations or activities of the Federal Government.

The ACLJ has requested information and records specifically concerning DOJ and FBI actions surrounding the Attorney General Loretta Lynch's meeting with former President Bill Clinton on June 27, 2016, which occurred on her airplane at the Sky Harbor International Airport in Phoenix, Arizona, and all participation in such DOJ/FBI briefings, meetings and communications by the DOJ/FBI and any of its personnel, and all other DOJ/FBI actions related to this meeting, is relevant to shed light on identifiable activities of the government.

### § 16.10(k)(2)(ii): Disclosure of the requested records will be meaningfully informative about government operations or activities and will be "likely to contribute" to an increased public understanding of those operations or activities.

The ACLJ's request will contribute and provide meaningful understanding of United States Government operations or activities within the DOJ and FBI.  With respect to the request for

records surrounding the meeting between the head of the DOJ and the husband of a person who, at the time, was under criminal investigation by the DOJ and FBI, and where such meeting occurred approximately within a week of the FBI's interview of the person under investigation and the DOJ's decision not to press charges, these records have not currently been released to the public and will most certainly inform and increase public knowledge (1) about who knew or was involved in the meeting; (2) who was involved in allowing the meeting to take place; (3) what was discussed in connection the meeting and decisions surrounding the meeting; (4) why the meeting was allowed to take place; and (5) who, outside the DOJ/FBI, communicated with DOJ/FBI officials before, during or after the meeting. The request will also reveal what involvement, if any, any other agency or governmental officials had with the meeting.

> **§ 16.10(k)(2)(iii): The disclosure will contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester. The requester has expertise in the subject area as well as the ability and intention to effectively convey information to the public. It shall be presumed that a representative of the news media will satisfy this consideration.**

Releasing the requested information to the ACLJ will contribute "significantly" to the public's understanding of United States Government operations and activities. The ACLJ has researched and litigated to uphold governmental transparency and accountability. The ACLJ is qualified to analyze and assess whether official statements to the press, the actions those statements identify, and the actions actually taken and decisions actually made in connection with the meeting and in the meeting's aftermath, violate pertinent law or regulations.

The ACLJ intends to release the information, once analyzed and assessed, to the public through its numerous media outlets. Those outlets include but are not limited to its Internet website (www.aclj.org), email list, radio programs, television programs, press releases, and regular mailing list, as described above. The audience to which the ACLJ intends to disseminate the requested information is reasonably broad. The ACLJ has been disseminating relevant information concerning fundamental and constitutional freedoms and governmental accountability since its founding in 1990, and has since then expanded its work and notoriety on an international level, achieving credibility in a wide range of media outlets, as described above. Also as described above, the ACLJ qualifies as a representative of the news media and as such, it is presumed that this consideration is satisfied.

> **§ 16.10(k)(2)(iv): The public's understanding of the subject in question will be enhanced by the disclosure to a significant extent. Components shall not make value judgments about whether the information at issue is "important" enough to be made public.**

Releasing the information described above will significantly contribute to the public's understanding through ACLJ review and assessment of the materials and information, and subsequent dissemination of the information to the public. Such review, assessment, and dissemination will help the public understand whether the DOJ or FBI complied with

applicable law and regulations concerning the meeting and its statements to the press concerning the meeting and its aftermath. Where current media reports, though extensive in number, on the subject of this request address the topic, apparently only one media source was at the location of the meeting, and the records requested will provide actual and authoritative sources for what actually happened, who was involved, and why.

> **§ 16.10(k)(3)(i): The requester has no commercial interest, as defined in paragraph (b)(1) of this section, that would be furthered by the requested disclosure.**

As explained and described throughout this Memorandum, the ACLJ is a not-for-profit 50l(c)(3) organization dedicated to the defense of constitutional liberties secured by law and the public dissemination of information by way of its numerous media platforms. The information sought by the ACLJ is in furtherance of its not-for-profit mission statement. The ACLJ has no commercial interest in the information sought or its dissemination thereof.

> **§ 16.10(k)(3)(ii): A waiver or reduction of fees is justified because the requester had no commercial interest in disclosure. Components ordinarily shall presume that where a news media requester has satisfied the public interest standard, the public interest will be the interest primarily served by disclosure to that requester.**

Again, the ACLJ has no commercial interest in the information sought or its dissemination thereof. Rather, its interest is purely to further its not-for-profit mission. Therefore, its interest cannot be founded "primarily" in a commercial interest. This is especially so because the ACLJ cannot operate for a commercial purpose under its grant of 501(c)(3) tax-exempt status.

For these reasons, the ACLJ is entitled to a fee waiver.

## II.   EXPEDITED PROCESSING REQUEST

The ACLJ seeks expedited processing of its request under 5 U.S.C. § 552(a)(6)(E), and the DOJ's attendant regulation, 28 C.F.R. § 16.5(e). As defined by statute, a "compelling need" is one "with respect to a request made by a person primarily engaged in disseminating information," where there is an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).   According to 28 C.F.R. § 16.5(e)(1):

> (e) Expedited processing. (1) Requests and appeals shall be processed on an expedited basis whenever it is determined that they involve:
>
> . . . .
>
> (ii) An urgency to inform the public about an actual or alleged Federal Government activity, if made by a person who is primarily engaged in

disseminating information;

. . . .

(iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity that affect public confidence.

§ 16.5(e)(1)(ii), (iv).  The DOJ's regulation, 28 C.F.R. § 16.5(e)(3), provides:

A requester who seeks expedited processing must submit a statement, certified to be true and correct, explaining in detail the basis for making the request for expedited processing. For example, under paragraph (e)(1)(ii) of this section, a requester who is not a full-time member of the news media must establish that the requester is a person whose primary professional activity or occupation is information dissemination, though it need not be the requester's sole occupation. Such a requester also must establish a particular urgency to inform the public about the government activity involved in the request—one that extends beyond the public's right to know about government activity generally. The existence of numerous articles published on a given subject can be helpful in establishing the requirement that there be an "urgency to inform" the public on the topic. As a matter of administrative discretion, a component may waive the formal certification requirement.

§ 16.5(e)(3).

Pursuant to 28 C.F.R. § 16.5(e)(3), the ACLJ's primary professional activity or occupation is information dissemination, though it is not the requester's sole occupation.  As detailed above under Section I(A) concerning the requester's qualification as a news media representative:

(1)     The ACLJ reaches a vast audience through a variety of media outlets, including the Internet (World Wide Web page, www.aclj.org), radio, television, press releases, and direct mailings to our supporters.

(2)     The ACLJ's Internet site received an average of 822,000 unique visitors per month in 2015, with 22,000,000 page views.  Our current email list holds 1,050,000 active names (actual list size is 2,340,690).  In 2015, the ACLJ sent 278,000,000 emails.

(3)     The ACLJ's radio audience consists of more than 1,150,000 estimated daily listeners on 873 radio stations nationwide, including SiriusXM satellite radio. Additionally, the ACLJ hosts a weekly television program, *Sekulow*, broadcast on eight networks: Cornerstone Television, Daystar Television Network, AngelOne, KAZQ, TBN, VTN, The Walk TV, and HisChannel. *See* http://aclj.org/radio-tv/schedule (listing schedule).

(4)     The ACLJ also disseminates news and information to over 1,000,000 addresses on its mailing lists.  In 2015, the ACLJ sent 15,000,000 pieces of mail.

(5)     ACLJ Chief Counsel, Jay Sekulow, has regularly appeared on various news and talk show programs to discuss the issues and events important to the ACLJ and its

audiences. These include shows on FOX News, MSNBC, CNN, ABC, CBS, and NBC. In addition to television programs, Jay Sekulow has also appeared on national radio broadcasts. Beyond broadcast outlets, Jay Sekulow's comments appear regularly in the nation's top newspapers, in print and online editions, including but not limited to the Wall Street Journal, New York Times, Washington Times, Washington Post, L.A. Times, and USA Today. His comments also appear in major national newswire services that include, but are not limited to, Associated Press, Reuters, and Bloomberg.

The District Court for the District of Columbia found that a non-profit public interest group, not unlike the ACLJ, qualified as "representative of the news media" where the group disseminated an electronic newsletter and published books. *Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 10–15 (D.D.C. 2003).

Clearly, the ACLJ satisfies the requirement of being one "whose primary professional activity or occupation is information dissemination." 28 C.F.R. § 16.5(e)(3).

Also pursuant to 28 C.F.R. § 16.5(e)(3), the requester "must establish a particular urgency to inform the public about the government activity involved in the request—one that extends beyond the public's right to know about government activity generally." § 16.5(e)(3). And, "[t]he existence of numerous articles published on a given subject can be helpful in establishing the requirement that there be an 'urgency to inform' the public on the topic." § 16.5(e)(3).

The ACLJ's FOIA request qualifies as compelling under the second statutory definition stated above and as one of particular urgency under the DOJ's regulations, because the ACLJ has an urgency to inform the public about the United States government activity that could seriously undermine or enhance the integrity of the justice system of the United States in its investigation of public figures. The DOJ and the FBI have come under significant criticism in connection with the meeting that is the subject of this FOIA Request. The records requested could exonerate the DOJ and the FBI and restore the public's confidence in those critical government offices. Or the records could confirm or refute the cause for criticism. Either way, the records will educate the public on what really happened.

As one district court explained, the required "compelling need" and "urgency to inform" are determined by three factors:

> (1) [W]hether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity.

*ACLU v. United States DOJ,* 321 F. Supp. 2d 24, 29 (D.D.C. 2004) (citing *Al-Fayed v. CIA,* 254 F.3d 300, 310 (2002)).

Such is the case presented by the ACLJ's FOIA request. The ACLJ's request is based upon

an urgency to inform the American public because a delay in review of the information would compromise the integrity of the public's confidence in the nation's law enforcement offices in connection with the investigation of and decision to not press charges against a public figure — which is a currently pressing issue. The actions of some of the highest-ranking officials in the United States are now under close scrutiny with regard to the DOJ and FBI's decisions concerning the meeting at issue. As mentioned in the ACLJ's request, which is incorporated by reference as if fully set forth herein, the press is currently and actively reporting on these very issues. *Numerous* media and press articles have been published on major and minor news outlets, which have not been cited or included herein for purposes of not burdening the request-recipients with excess paper.

Without the immediate release of the information requested, the American public will remain in the dark with respect to its own government's activities, functions, and decisions concerning the head of the DOJ meeting privately with the husband of a person under criminal investigation, and thus cannot hold their government officials accountable. Moreover, a delay in releasing the information prolongs justice and serves only to further embarrass the United States both domestically and internationally, and confuse the public about what actually happened, as delay is perceived as an attempt to cover up information or to shift or avoid blame or culpability. Thus, governmental accountability in justice and integrity serve as significant public interests at stake. The records requested herein are the subject of current and ongoing media reporting. This is a current, ongoing issue and the public's right to now is best served by expedited processing.

Clearly, "the request concerns a matter of current exigency to the American public"; "the consequences of delaying a response would compromise a significant recognized interest"; "the request concerns federal government activity." *ACLU,* 321 F. Supp. 2d at 29.

\* \* \* \* \*

As noted in the ACLJ's FOIA request, President Obama's Freedom of Information Act Memorandum of January 21, 2009, declares that accountability and openness ought to prevail with regard to FOIA requests:

> A democracy requires accountability, and accountability requires transparency. As Justice Louis Brandeis wrote, "sunlight is said to be the best of disinfectants." In our democracy, the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national commitment to ensuring an open Government. At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike.

> The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails. The Government should not keep information confidential merely because public officials might be embarrassed by disclosure, because errors and failures might be revealed, or

because of speculative or abstract fears. Nondisclosure should never be based on an effort to protect the personal interests of Government officials at the expense of those they are supposed to serve. In responding to requests under the FOIA, executive branch agencies (agencies) should act promptly and in a spirit of cooperation, recognizing that such agencies are servants of the public.

All agencies should adopt a presumption in favor of disclosure, in order to renew their commitment to the principles embodied in FOIA, and to usher in a new era of open Government. The presumption of disclosure should be applied to all decisions involving FOIA.[1]

Accordingly, ACLJ respectfully submits a request for waiver of fees and expedited processing of its contemporaneously submitted FOIA request.

## III.  CERTIFICATION

In satisfaction of certification requirements under 5 U.S.C. § 552(a)(6)(E)(vi) and corresponding regulations, the ACLJ incorporates by reference herein all relevant facts, media reports, and information as stated in the ACLJ's FOIA request in support thereof and certifies that the information provided and stated herein is true and correct to the best of the undersigned's knowledge and belief.

Colby M. May
Senior Counsel
American Center for Law and Justice
201 Maryland Avenue, NE
Washington, DC  20002-5703
(202) 546-8890
(202) 546-9309 fax
cmmay@aclj-dc.org

cc:    FOIA/PA Mail Referral Unit, Department of Justice
       Director of Public Affairs, Office of Public Affairs, Department of Justice

---

[1] PRESIDENT BARACK OBAMA, MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES RE: FREEDOM OF INFORMATION ACT (Jan. 21, 2009), *available at* https://www.whitehouse.gov/the_press_office/FreedomofInformationAct.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. A. No. 1:17-cv-01866 |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) ) |

# EXHIBIT B



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

August 5, 2016

DR. JAY ALAN SEKULOW
AMERICAN CENTER FOR LAW AND JUSTICE
201 MARYLAND AVENUE, NE
WASHINGTON, DC 20002

> FOIPA Request No.: 1355324-000
> Subject: Meeting between Attorney General
> Loretta Lynch and President Bill Clinton
> (June 27, 2016)

Dear Dr. Sekulow:

This acknowledges receipt of your Freedom of Information Act (FOIA) request to the FBI.

☑    Your request has been received at FBI Headquarters for processing.

☐    Your request has been received at the _____ Resident Agency / _____ Field Office and forwarded to FBI Headquarters for processing.

☑    We are searching for information responsive to this request.   We will inform you of the results in future correspondence.

☐    The subject of your request is currently being processed for public release.   Documents will be released to you upon completion.

☐    Release of responsive records will be made to the FBI's FOIA Library (The Vault). http:/vault.fbi.gov, and you will be contacted when the release is posted.

☑    Your request for a fee waiver is being considered and you will be advised of the decision at a later date.   If your fee waiver is denied, you will be charged fees in accordance with the category designated below.

☑    For the purpose of assessing fees, we have made the following determination:

    ☐    As a commercial use requester, you will be charged applicable search, review, and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(I).

    ☑    As an educational institution, noncommercial scientific institution or representative of the news media requester, you will be charged applicable duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(II).

    ☐    As a general (all others) requester, you will be charged applicable search and duplication fees in accordance with 5 USC § 552 (a)(4)(A)(ii)(III).

Please check the status of your FOIPA request at www.fbi.gov/foia by clicking on **FOIPA Status** and entering your FOIPA Request Number.   Status updates are adjusted weekly.   The status of newly assigned requests may not be available until the next weekly update.   If the FOIPA has been closed the notice will indicate that appropriate correspondence has been mailed to the address on file.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.   Your patience is appreciated.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.  Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."  Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@ic.fbi.gov.  If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so that it may be easily identified.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. A. No. 1:17-cv-01866 |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) ) |

# EXHIBIT C



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

August 5, 2016

DR. JAY ALAN SEKULOW
AMERICAN CENTER FOR LAW AND JUSTICE
201 MARYLAND AVENUE, NE
WASHINGTON, DC 20002

> FOIPA Request No.: 1355324-000
> Subject: Meeting between Attorney General Loretta
> Lynch and President Bill Clinton
> (June 27, 2016)

Dear Dr. Sekulow:

This is in reference to your letter to the FBI, in which you requested expedited processing for the above-referenced Freedom of Information Act (FOIA) request.   Under Department of Justice (DOJ) standards, expedited processing can only be granted in the following situations.

You have requested expedited processing according to:

☐   28 C.F.R. §16.5 (e)(1)(i): "Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."

☑   28 C.F.R. §16.5 (e)(1)(ii): "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

☐   28 C.F.R. §16.5 (e)(1)(iii): "The loss of substantial due process of rights."

☐   28 C.F.R. §16.5 (e)(1)(iv): "A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

You have not provided enough information concerning the statutory requirements for expedition; therefore, your request is denied.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.   Your patience is appreciated.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@ic.fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so that it may be easily identified.

Sincerely,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. A. No. 1:17-cv-01866 |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) ) |

# EXHIBIT D



U.S. Department of Justice

_____

Federal Bureau of Investigation

*Washington, D.C. 20535*

August 23, 2016

DR. JAY ALAN SEKULOW
AMERICAN CENTER FOR LAW AND JUSTICE
201 MARYLAND AVENUE, NE
WASHINGTON, DC 20002

FOIPA Request No.: 1355324-000
Subject: Meeting between Attorney General
Loretta Lynch and President Bill Clinton
(June 27, 2016)

Dear Dr. Sekulow:

This is in reference to your letter directed to the Federal Bureau of Investigation (FBI), in which you requested expedited processing for the above-referenced Freedom of Information Act (FOIA) request. Pursuant to the Department of Justice (DOJ) standards permitting expedition, expedited processing can only be granted when it is determined that a FOIPA request involves one or more of the below categories.

You have requested expedited processing according to:

☐   **28 C.F.R. §16.5 (e)(1)(i):** "Circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."

☐   **28 C.F.R. §16.5 (e)(1)(ii):** "An urgency to inform the public about an actual or alleged federal government activity, if made by a person primarily engaged in disseminating information."

☐   **28 C.F.R. §16.5 (e)(1)(iii):** "The loss of substantial due process of rights."

☑   **28 C.F.R. §16.5 (e)(1)(iv):** "A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."

Upon further review of the request, it was determined that you provided enough information concerning 28 C.F.R. §16.5 (e)(1)(iv); therefore, your request is approved.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request number listed above has been assigned to your request. Please use this number in all correspondence concerning your request. Your patience is appreciated.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site: https://foiaonline.regulations.gov/foia/action/public/home. Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@ic.fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so that it may be easily identified.

Sincerely,

David M. Hardy
Section Chief
Record/Information
  Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civ. A. No. 1:17-cv-01866 |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) ) |

# EXHIBIT E



U.S. Department of Justice

_____

Federal Bureau of Investigation
_____
*Washington, D.C. 20535*

October 21, 2016

DR. JAY ALAN SEKULOW
AMERICAN CENTER FOR LAW AND JUSTICE
201 MARYLAND AVENUE, NE
WASHINGTON, DC 20002

Request No.: 1355324-000
Subject: Meeting between Attorney General
Loretta Lynch and President Bill Clinton
(June 27, 2016)

Dear Dr. Sekulow:

This is in response to your Freedom of Information Act (FOIA) request.   No records responsive to your request were located.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.   See 5 U.S.C. § 552(c) (2006 & Supp. IV (2010)   This response is limited to those records that are subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request.   Please use this number in all correspondence concerning your request.   Your patience is appreciated.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

You may seek dispute resolution services by contacting the Office of Government Information Services (OGIS) at 877-684-6448, or by emailing ogis@nara.gov.   Alternatively, you may contact the FBI's FOIA Public Liaison by emailing foipaquestions@ic.fbi.gov.   If you submit your dispute resolution correspondence by email, the subject heading should clearly state "Dispute Resolution Services."   Please also cite the FOIPA Request Number assigned to your request so that it may be easily identified.

Enclosed for your information is a copy of the FBI Fact Sheet.

Sincerely,

David M. Hardy
Section Chief
Record/Information
   Dissemination Section
Records Management Division

Enclosure



# FBI FACT SHEET

- **The primary functions of the FBI are national security and law enforcement.**

- **The FBI does not keep a file on every citizen of the United States.**

- **The FBI was not established until 1908 and we have very few records prior to the 1920s.**

- **FBI files generally contain reports** of FBI investigations of a wide range of matters, including counterterrorism, counter-intelligence, cyber crime, public corruption, civil rights, organized crime, white collar crime, major thefts, violent crime, and applicants.

- **The FBI does not issue clearances or non-clearances for anyone other than its own personnel or persons having access to FBI facilities.**   Background investigations for security clearances are conducted by many different Government agencies.   Persons who received a clearance while in the military or employed with some other government agency should contact that entity.   Most government agencies have websites which are accessible on the internet which have their contact information.

- **An identity history summary check or "rap sheet" is NOT the same as an "FBI file."** It is a listing of information taken from fingerprint cards and related documents submitted to the FBI in connection with arrests, federal employment, naturalization or military service.   The subject of a "rap sheet" may obtain a copy by submitting a written request to FBI CJIS Division – Summary Request, 1000 Custer Hollow Road, Clarksburg, WV 26306. Along with a specific written request, the individual must submit a new full set of his/her fingerprints in order to locate the record, establish positive identification, and ensure that an individual's records are not disseminated to an unauthorized person.   The fingerprint submission must include the subject's name, date and place of birth.   There is a required fee of $18 for this service, which must be submitted by money order or certified check made payable to the Treasury of the United States.   A credit card payment option is also available.   Forms for this option and additional directions may be obtained by accessing the FBI Web site at www.fbi.gov/about-us/cjis/identity-history-summary-checks.

- **The National Name Check Program (NNCP)** conducts a search of the FBI's Universal Index (UNI) to identify any information contained in FBI records that may be associated with an individual and provides the results of that search to a requesting federal, state or local agency.   Names are searched in a multitude of combinations and phonetic spellings to ensure all records are located.   The NNCP also searches for both "main" and "cross reference" files.   A main file is an entry that carries the name corresponding to the subject of a file, while a cross reference is merely a mention of an individual contained in a file.   The results from a search of this magnitude can result in several "hits" and "idents" on an individual.   In each instance where UNI has identified a name variation or reference, information must be reviewed to determine if it is applicable to the individual in question.

- **The Record/Information Dissemination Section (RIDS)** searches for records and provides copies of FBI files responsive to Freedom of Information or Privacy Act (FOIPA) requests for information.   RIDS provides responsive documents to requesters seeking "reasonably described information."   For a FOIPA search, the subject's name, event, activity, or business is searched to determine whether there is an associated investigative file.   This is called a "main file search" and differs from the **NNCP** search.

**FOR GENERAL INFORMATION ABOUT THE FBI, VISIT OUR WEBSITE AT**
**www.fbi.gov**

7/18/16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civ. A. No. 1:17-cv-01866<br>)<br>)<br>)<br>)<br>)<br>) |

# EXHIBIT F



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

August 10, 2017

MR. JAY SEKULOW
AMERICAN CENTER FOR LAW AND JUSTICE
201 MARYLAND AVENUE NORTHEAST
WASHINGTON, DC 20002-5703

FOIPA Request No.: 1355324-001
Subject: Meeting between Attorney General
Loretta Lynch and President Bill Clinton
(June 27, 2016)

Dear Mr. Sekulow:

The purpose of this letter is to advise of the change in status of your Freedom of Information Act (FOIA) request submitted to the Federal Bureau of Investigation (FBI).

You submitted a request by letter dated July 15, 2016 to this office seeking various records of, or related to, the subject meeting above.   You also submitted an identical request of the same date to the Department of Justice (DOJ), FOIA/PA Mail Referral Unit.

By letter dated October 21, 2016, the FBI advised you it had located no records responsive to your request (FOIPA Number 1355324-000).   Subsequently, the Department of Justice (DOJ) forwarded communications it located per its search on the identical request to FBI for consultation, and the FBI identified a limited number of privacy redactions (Exemptions b6 and b7C) to protect the identities of FBI personnel contained within these communications.  As a result, your request has been reopened under the FOIPA number listed above as the FBI has determined records potentially responsive to your request may exist.  We are currently in the process of searching for any responsive material.

For questions regarding our determinations, or to check the status of your FOIPA request, please visit the www.fbi.gov/foia website under "Contact Us."  The FOIPA Request number listed above has been assigned to your request.  Please use this number in all correspondence concerning your request.  Your patience is appreciated.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civ. A. No. 1:17-cv-01866<br>)<br>)<br>)<br>)<br>)<br>) |

# EXHIBIT G

**FOIPAQUESTIONS**

| | |
|---|---|
| **From:** | FOIPAQUESTIONS |
| **Sent:** | Monday, September 11, 2017 3:19 PM |
| **To:** | 'Carly Gammill'; Colby May |
| **Cc:** | Abby Southerland; Miles Terry (mterry@aclj.org); Ben Sisney |
| **Subject:** | RE: FOIA Request: 1355324-001; Authorization to Communicate with ACLJ's Carly Gammill, Esq. |

Dear Ms. Gammill,

This is in response to your inquiry regarding a time frame for completion regarding requests for expedited processing.  Once expedited processing has been approved, the Record/Information Dissemination Section will process the request "as soon as practicable."

If you require additional assistance please feel free to contact foipaquestions@fbi.gov.

Thank you,

*Leanna Ramsey*
**Public Information Officer**
Record/Information Dissemination Section (RIDS) FBI-Records Management Division
170 Marcel Drive, Winchester, VA 22602-4843
Direct: (540) 868-4593
Fax: (540) 868-4391/4997
Questions E-mail: foipaquestions@fbi.gov

Do you have further questions about the FOI/PA process? Visit us at http://www.fbi.gov/foia

Please check the status of your request online at https://vault.fbi.gov/fdps-1/@@search-fdps   Status updates are performed on a weekly basis.

**From:** Carly Gammill [mailto:cgammill@aclj-dc.org]
**Sent:** Monday, September 11, 2017 3:13 PM
**To:** FOIPAQUESTIONS <FOIPAQUESTIONS@FBI.GOV>; Colby May <cmmay@aclj-dc.org>
**Cc:** Abby Southerland <asoutherland@aclj.org>; Miles Terry (mterry@aclj.org) <mterry@aclj.org>; Ben Sisney <bsisney@aclj.org>
**Subject:** RE: FOIA Request: 1355324-001; Authorization to Communicate with ACLJ's Carly Gammill, Esq.

Ms. Ramsey,

I appreciate your speaking with me this afternoon. You confirmed that the initial grant of expedited processing will be applied to the re-opened request. What is the typical timeframe in which the FBI responds to requests subject to expedited processing?

Thank you,

Carly F. Gammill, Esq.
Senior Litigation Counsel
American Center for Law & Justice
625 Bakers Bridge Avenue, Ste 105-121

1

Franklin, TN 37067
Ph: (800) 296-4529
Fax: (615) 309-8632
cgammill@aclj-dc.org

CONFIDENTIALITY & METADATA NOTICE:

This message and any attached documents contain information from the nonprofit public interest law firm of the American Center for Law and Justice (ACLJ) that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. All recipients are also hereby notified that any metadata contained in any document attached to this message has been sent inadvertently and should not be reviewed without the consent of the ACLJ. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**From:** FOIPAQUESTIONS [mailto:FOIPAQUESTIONS@FBI.GOV]
**Sent:** Monday, September 11, 2017 1:58 PM
**To:** Colby May
**Cc:** Carly Gammill; Abby Southerland; Miles Terry (mterry@aclj.org); Ben Sisney; Glinda Corbin
**Subject:** RE: FOIA Request: 1355324-001; Authorization to Communicate with ACLJ's Carly Gammill, Esq.

Thank you.

Ms. Gammill, I returned your call at the number you provided and received a message indicating it is not a valid extension.  Do you have another phone number I should call you on?

Respectfully,


*Leanna Ramsey*
**Public Information Officer**
Record/Information Dissemination Section (RIDS) FBI-Records Management Division
170 Marcel Drive, Winchester, VA 22602-4843
Direct: (540) 868-4593
Fax: (540) 868-4391/4997
Questions E-mail: foipaquestions@fbi.gov

Do you have further questions about the FOI/PA process? Visit us at http://www.fbi.gov/foia

Please check the status of your request online at https://vault.fbi.gov/fdps-1/@@search-fdps   Status updates are performed on a weekly basis.



**From:** Colby May [mailto:cmmay@aclj-dc.org]
**Sent:** Monday, September 11, 2017 11:47 AM
**To:** FOIPAQUESTIONS <FOIPAQUESTIONS@FBI.GOV>
**Cc:** Carly Gammill <cgammill@aclj-dc.org>; Abby Southerland <asoutherland@aclj.org>; Miles Terry (mterry@aclj.org) <mterry@aclj.org>; Ben Sisney <bsisney@aclj.org>; Glinda Corbin <gmcorbin@aclj-dc.org>
**Subject:** FOIA Request: 1355324-001; Authorization to Communicate with ACLJ's Carly Gammill, Esq.

Dear Ms. Leanna Ramsey:

In connection with the American Center for Law and Justice's FOIA Request: 1355324-001, this is to authorize your direct communications with my colleague, Ms. Carly F. Gammill, Esq., an attorney with the ACLJ. If you have any questions, or need anything additional from me to directly communicate with Ms. Gammill, please let me know.

Thank you for your work on this matter.

Kind regards,

Colby M. May

ACLJ
American Center
for Law & Justice

Colby M. May, Esq.
Director & Senior Counsel, Washington Office
201 Maryland Avenue, NE
Washington, D.C. 20002
(202) 546-8890
Fax (202) 546-9309
cmmay@aclj-dc.org

CONFIDENTIALITY NOTICE  This electronic message from the American Center for Law and Justice and/or American Center for Law and Justice - District of Columbia (together ACLJ) and any accompanying documents or embedded messages is intended only for the addressee(s) named above. ACLJ is a legal entity engaged in the practice of law, and this communication contains information, which may include metadata, that is confidential, privileged, attorney-client, attorney work product, or otherwise protected from disclosure under applicable law. If you have received this message in error, are not a named recipient, or are not the person, employee, or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or any attached file is strictly prohibited. If you have received this message in error, please immediately notify the sender and permanently delete the message. IRS CIRCULAR 230 DISCLOSURE (31 CFR Part 10): Any tax advice contained in this communication (including any attachments) was not intended to be used, and cannot be used, for the purpose of avoiding any U.S. tax penalties that may be imposed on you, or for the purpose of promoting, marketing, or recommending any transaction or matter addressed herein.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CENTER FOR LAW AND JUSTICE | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civ. A. No. 1:17-cv-01866 |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) ) ) |
| Defendant. | ) ) ) |

# EXHIBIT H



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

November 30, 2017

MS. ABIGAIL A. SOUTHERLAND
MR. JAY SEKULOW
AMERICAN CENTER FOR LAW AND JUSTICE
201 MARYLAND AVENUE NORTHEAST
WASHINGTON, DC 20002-5703

FOIPA Request No.: 1355324-001
Subject: Meeting between Attorney General Loretta
Lynch and President Bill Clinton
(June 27, 2016)

*ACLJ v. U.S. Department of Justice*
Civil Action No. 17-cv-01866

Dear Ms. Southerland and Mr. Sekulow:

The enclosed documents were reviewed under the Freedom of Information Act (FOIA), Title 5, United States Code, Section 552. Deletions have been made to protect information which is exempt from disclosure, with the appropriate exemptions noted on the page next to the excision. The exemptions used to withhold information are marked below and explained on the enclosed Explanation of Exemptions:

|  | **Section 552** |  |  |  | **Section 552a** |
|---|---|---|---|---|---|
| ☐ (b)(1) | | ☐ (b)(7)(A) | | ☐ (d)(5) | |
| ☐ (b)(2) | | ☐ (b)(7)(B) | | ☐ (j)(2) | |
| ☐ (b)(3) | | ☑ (b)(7)(C) | | ☐ (k)(1) | |
| _____ | | ☐ (b)(7)(D) | | ☐ (k)(2) | |
| _____ | | ☐ (b)(7)(E) | | ☐ (k)(3) | |
| _____ | | ☐ (b)(7)(F) | | ☐ (k)(4) | |
| ☐ (b)(4) | | ☐ (b)(8) | | ☐ (k)(5) | |
| ☑ (b)(5) | | ☐ (b)(9) | | ☐ (k)(6) | |
| ☑ (b)(6) | | | | ☐ (k)(7) | |

29 pages were reviewed and 29 pages are being released.

☑    Deletions were made by the Department of Justice, Office of Information Policy (OIP). To appeal those denials, please write directly to that agency at the following address:

Office of Information Policy
U.S. Department of Justice
Suite 11050
1425 New York Avenue, NW
Washington, DC 20530

☐    In accordance with standard FBI practice and pursuant to FOIA exemption (b)(7)(E) and Privacy Act exemption (j)(2) [5 U.S.C. § 552/552a (b)(7)(E)/(j)(2)], this response neither confirms nor denies the existence of your subject's name on any watch lists.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.   See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010).   This response is limited to those records that are subject to the requirements of the FOIA.   This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist. Enclosed for your information is a copy of the Explanation of Exemptions.

Although your request is in litigation, we are required by 5 USC § 552 (a)(6)(A) to provide you the following information concerning your right to appeal.   You may file an appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, Suite 11050, 1425 New York Avenue, NW, Washington, D.C. 20530-0001 or you may submit an appeal through OIP's FOIAonline portal by creating an account on the following web site:  https://foiaonline.regulations.gov/foia/action/public/home.   Your appeal must be postmarked or electronically transmitted within ninety (90) days from the date of this letter in order to be considered timely.   If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."   Please cite the FOIPA Request Number assigned to your request so that it may be easily identified.

☐   The enclosed material is from the main investigative file(s) in which the subject(s) of your request was the focus of the investigation.   Our search located additional references, in files relating to other individuals, or matters, which may or may not be about your subject(s).   Our experience has shown when ident, references usually contain information similar to the information processed in the main file(s).   Because of our significant backlog, we have given priority to processing only the main investigative file(s).   If you want the references, you must submit a separate request for them in writing, and they will be reviewed at a later date, as time and resources permit.

☑   See additional information which follows.

Sincerely,

David M. Hardy
Section Chief
Record/Information
   Dissemination Section
Records Management Division

Enclosure(s)

The enclosed documents represent the final release of information responsive to your Freedom of Information Act (FOIA) request.

This material is being provided to you at no charge.   Accordingly, it is unnecessary to adjudicate your request for a fee waiver as no fees are being assessed.

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI-DOJ

**Bowdich, David L. (DO) (FBI)**

| | |
|---|---|
| **From:** | Bowdich, David L. (DO) (FBI) |
| **Sent:** | Wednesday, June 29, 2016 4:07 PM |
| **To:** | James B. Comey |
| **Subject:** | RE: FYI only |

Got it, thanks sir.

Dave

From: James B. Comey
Sent: Wednesday, June 29, 2016 4:04 PM
To: Kortan, Michael P. (DO) (FBI)                    Rybicki, James E. (DO) (FBI)
                        Mccabe, Andrew G. (DO) (FBI)                    Bowdich, David L.    b6  -1
(DO) (FBI)
Subject: FYI only

http://nation.foxnews.com/2016/06/29/why-did-bill-clinton-and-loretta-lynch-meet-her-airplane-phoenix-week

**Kortan, Michael P. (DO) (FBI)**

| | |
|---|---|
| **From:** | Kortan, Michael P. (DO) (FBI) |
| **Sent:** | Wednesday, June 29, 2016 4:42 PM |
| **To:** | Mccabe, Andrew G. (DO) (FBI); Rybicki, James E. (DO) (FBI); Bowdich, David L. (DO) (FBI) |
| **Cc:** | James B. Comey |
| **Subject:** | From DOJ.... |

From: Newman, Melanie (OPA) [mailto:Melanie.Newman@usdoj.gov]
Sent: Wednesday, June 29, 2016 4:39 PM
To: Quinn, Richard P. (DO) (FBI)⬚⬚⬚⬚⬚⬚⬚⬚⬚ Kortan, Michael P. (DO) (FBI)      b6 -1
Cc: Lewis, Kevin S. (OPA) (JMD) <Kevin.S.Lewis@usdoj.gov>
Subject: FLAG

I want to flag a story that is gaining some traction tonight. Daily Caller, The Hill and FOX News have picked up a local Phoenix news report about a casual, unscheduled meeting between former president Bill Clinton and the AG. It happened on Monday night. Our talkers on this are below, along with the transcript from the AG's Phoenix presser, where she was asked about this. Happy to discuss further by phone. Please let me know if you get any questions about this. Thanks.

**TRANSCRIPT**

**REPORTER:** Sources say that you met last night with former president Bill Clinton. Did the topic of Benghazi come up at all, or can you tell us what was discussed?

**ATTORNEY GENERAL LYNCH:** No. Actually, while I was landing at the airport, I did see President Clinton at the Phoenix airport as I was leaving, and he spoke to myself and my husband on the plane. Our conversation was a great deal about his grandchildren. It was primary social and about our travels. He mentioned the golf he played in Phoenix, and he mentioned travels he'd had in West Virginia. We talked about former Attorney General Janet Reno, for example, whom we both know, but there was no discussion of any matter pending before the department or any matter pending before any other body. There was no discussion of Benghazi, no discussion of the state department emails, by way of example. I would say the current news of the day was the Brexit decision, and what that might mean. And again, the department's not involved in that or implicated in that.

b5 per OIP

FBI 2

b5 per OIP

Melanie R. Newman
Director, Office of Public Affairs
U.S. Department of Justice
Direct: 202-305-1920
Cell:                b6 per OIP
@MelanieDOJ

**Mccabe, Andrew G. (DO) (FBI)**

| | |
|---|---|
| **From:** | Mccabe, Andrew G. (DO) (FBI) |
| **Sent:** | Friday, July 01, 2016 6:10 AM |
| **To:** | James B. Comey; Rybicki, James E. (DO) (FBI); Bowdich, David L. (DO) (FBI) |
| **Subject:** | Fwd: Lynch to Remove Herself From Decision Over Clinton Emails, Official Says - NYTimes.com |
| **Importance:** | High |

Fyi


Andrew G. McCabe
Deputy Director
Federal Bureau of Investigation                                                                                  b6 -1

------ Original message ------
From: "Priestap, E W. (CD) (FBI)"
Date: 07/01/2016 5:53 AM (GMT-05:00)                                                                    b6 -1
To: "Steinbach, Michael B. (DO) (FBI)"                                        "Mccabe, Andrew G. (DO)
(FBI)"
Subject: Fwd: Lynch to Remove Herself From Decision Over Clinton Emails, Official Says - NYTimes.com




------ Original message ------
From: "Strzok, Peter P. (CD) (FBI)"
Date: 07/01/2016 5:36 AM (GMT-05:00)
To: "Priestap, E W. (CD) (FBI)"                                   "Moffa, Jonathan C. (CD) (FBI)"
                                                                                        "Mains, Richard   b6 -1
A. (RO) (FBI)"
Subject: Fwd: Lynch to Remove Herself From Decision Over Clinton Emails, Official Says - NYTimes.com



http://mobile.nytimes.com/2016/07/02/us/politics/loretta-lynch-hillary-clinton-email-server.html?
 r=0&referer=https://www.google.com/

FBI-4

# Lynch to Remove Herself From Decision Over Clinton Emails, Official Says

Attorney General Loretta E. Lynch plans to announce on Friday that she will accept whatever recommendation career prosecutors and the F.B.I. director make about whether to bring charges related to Hillary Clinton's personal email server, a Justice Department official said. Her decision removes the possibility that a political appointee will overrule investigators in the case.

The Justice Department had been moving toward such an arrangement for months — officials said in April that it was being considered — but a private meeting between Ms. Lynch and former President Bill Clinton this week set off a political furor and made the decision all but inevitable.

Republicans said the meeting, which took place at the Phoenix airport, had compromised the independence of the investigation as the F.B.I. was winding it down. Some called for Ms. Lynch to recuse herself, but she did not take herself off the case — one that could influence a presidential election.

Ms. Lynch plans to discuss the matter at a conference in Aspen, Colo., on Friday. The Justice Department declined to comment. The official who confirmed the discussion did so on the condition of anonymity because the internal decision-making process is normally kept confidential.

The F.B.I. is investigating whether Mrs. Clinton, her aides or anyone else broke the law by setting up a private email server for her to use as secretary of state. Internal investigators have concluded that the server was used to send classified information, and Republicans have seized on the matter to question Mrs. Clinton's judgment.

For the Justice Department, the central question is whether the conduct met the legal standard for the crime of mishandling classified information.

Ms. Lynch said that the meeting with Mr. Clinton was unplanned, largely social and did not touch on the email investigation. She suggested that he walked uninvited from his plane to her government plane, both of which were parked on a tarmac at Phoenix Sky Harbor International Airport.

"He did come over and say hello, and speak to my husband and myself, and talk about his grandchildren and his travels and things like that," Ms. Lynch said at a news conference in Los Angeles on Wednesday, where she was promoting community policing. "That was the extent of that. And no discussions were held into any cases or things like that."

That did not mollify Republican lawmakers, who said the meeting raised questions about the integrity of the government's investigation.

"In light of the apparent conflicts of interest, I have called repeatedly on Attorney General Lynch to appoint a special counsel to ensure the investigation is as far from politics as possible," Senator John Cornyn, Republican of Texas and a member of the Judiciary Committee, said in a statement on Thursday.

The meeting created an awkward situation for Ms. Lynch, a veteran prosecutor who was nominated from outside Washington's normal political circles. In her confirmation, her allies repeatedly sought to

contrast her with her predecessor, Eric H. Holder Jr., an outspoken liberal voice in the administration who clashed frequently with Republicans who accused him of politicizing the office.

Ms. Lynch has said she wants to handle the Clinton investigation

**Kortan, Michael P. (DO) (FBI)**

| | |
|---|---|
| **From:** | Kortan, Michael P. (DO) (FBI) |
| **Sent:** | Friday, July 01, 2016 5:11 PM |
| **To:** | Mccabe, Andrew G. (DO) (FBI); Bowdich, David L. (DO) (FBI); Rybicki, James E. (DO) (FBI); Kelly, Stephen D. (DO) (FBI); Steinbach, Michael B. (DO) (FBI); Priestap, E W. (CD) (FBI); [_____] (DO) (FBI) |
| **Cc:** | James B. Comey |
| **Subject:** | AG transcript, Aspen Ideas festival, Fri 1 July |

b6 -1

**JONATHAN CAPEHART:** Thank you all for being here this morning.

Attorney General, thank you very much for being here.

**ATTORNEY GENERAL LORETTA LYNCH:** Thank you for having me.

**CAPEHART:** So as Walter said, you have a reputation of having the highest integrity, utmost solid judgment. So when people heard what went down in Phoenix, a lot of people were like -- I mean, friends, supporters, backers were saying, what on Earth was she thinking talking to Bill Clinton?

So what on Earth were you thinking?

(LAUGHTER)

What happened?

**LYNCH:** Well, I think that's the question of the day, isn't it?

**CAPEHART:** Yes.

**LYNCH:** And I think that's a perfectly reasonable question. I think that's the question that is called, you know, by what happened in Phoenix because people have also wondered and raised questions about my role in the ultimate resolution of matters involving the investigation into the State Department e-mails.

And to the extent that people have questions about that, about my role in that, certainly my meeting with him raises questions and concerns. And so believe me, I completely get that question. And I think it is the question of the day.

But I think the issue is, again, what is my role in how that matter is going to be resolved? And so let me be clear on how that is going to be resolved. I've gotten that question a lot also over time and we usually don't go into those deliberations, but I do think it's important that people see what that process is like.

As I have always indicated, the matter is being handled by career agents and investigators with the Department of Justice. They've had it since the beginning. They are independent...

**CAPEHART:** Which predates your tenure as attorney general.

**LYNCH:** It predates my tenure as attorney general. It is the same team and they are acting

FBI-7

independently  They follow the law, they follow the facts  That team will make findings  That is to say they will come up with a chronology of what happened, the factual scenario.

They will make recommendations as to how to resolve what those facts lead to. Those -- the recommendations will be reviewed by career supervisors in the Department of Justice and in the FBI and by the FBI director. And then, as is the common process, they present it to me and I fully expect to accept their recommendations.

CAPEHART: Now, what's interesting here is you say you fully expect to accept the recommendations. One thing people were saying this morning when the news -- when the news broke was that you were, quote, "recusing yourself" from having any kind of role in the final determination. Is that the case? Is that what you're saying?

LYNCH: Well, a recusal would mean that I wouldn't even be briefed on what the findings were or what the actions going forward would be  And while I don't have a role in those findings and coming up with those findings or making those recommendations as to how to go forward, I'll be briefed on it and I will be accepting their recommendations

CAPEHART: And when you say -- again, this must be the journalist in me and linguist in me -- accepting to me means here, Madam Attorney General, here are our findings, and you completely accept them wholeheartedly and then issue them to the public, or you accept them, look them over and then make your own determination as to what the final determinations will be?

LYNCH: No. The final determination as to how to proceed will be contained within the recommendations in the report in whatever format the team puts it together, that has not been resolved, whatever report they provide to me  There will be a review of their investigation, there will be a review of what they have found and determined to have happened and occurred, and there'll (ph) be their determinations as to how they feel that the case should proceed.

CAPEHART: And when you say there will be a review, this -- you mean the review will be done by you once you accept the recommendations and determinations...

(LAUGHTER)

LYNCH: No, I understand.

CAPEHART: ... or you're talking about the process of the review...

LYNCH: I'm talking about the initial...

CAPEHART: ... getting to that point?

LYNCH: ... process...

CAPEHART: Got it.

LYNCH: ... of how this case will be resolved. This case will be resolved by the team that's been working on it from the beginning. Supervisors always review matters  In this case, that review will be career people in the Department of Justice, and also the FBI will review it, up to and including the FBI director, and that will be the finalization of not just the factual findings, but the next steps in this matter.

CAPEHART: And I find it interesting, several times now you have made a point of saying career prosecutors, career officials within the Justice Department. Why -- why are you making that very hard distinction, that description?

LYNCH: I think a lot of the questions that I've gotten over the -- over the past several months, frankly,

about my role in this investigation and what it would likely be was a question or concern about whether someone who was a political appointee would be involved in deciding how to investigate a matter or what something meant or how should the case proceed going forward.

As I have always said, this matter would be handled by the career people who are independent. They live from administration to administration. Their role is to follow the facts and follow the law and make a determination as to what happened and what those next steps should be.

But you know, in my role as attorney general, there are cases that come up to me. I am informed of them from time to time. This case, as you know, has generated a lot of attention. I'll be informed of those findings as opposed to never reading them or never seeing them. But I will be accepting their recommendations and their plan for going forward.

CAPEHART: So The New York Times reported this morning that the Justice Department -- Justice Department officials said back in April that what you're talking about right now was already being considered. And so the question is, before President Clinton boarded your plane in Arizona, had you already made the determination that what you're announcing today was indeed what you were going to do?

LYNCH: Yes, I had already determined that that would be the process. And in large part it's because, as you -- as I'm sure you know, as a journalist, I do get this question a lot. And as I've set on occasions as to why we don't talk about ongoing investigations in terms of what's being discussed and who's being interviewed, is to preserve the integrity of that investigation. We also typically don't talk about the process by which we make decisions, and I have provided that response too.

But in this situation, you know, because I did have that meeting, it has raised concerns. I feel, and I feel that while I can certainly say this matter's going to be handled like any other, as it has always been, it's going to be resolved like any other, as it was always going to be. I think people need the information about exactly how that resolution will come about in order to know what that means and really accept that and have faith in the ultimate decision of the Department of Justice.

CAPEHART: So back to my first question, the what were you thinking question.

(LAUGHTER)

But let me put a different spin on it and ask, when you're -- you're on your plane -- from what I have been -- been in Washington a while and knowing how the protocol works, you land, folks get off, you get off, for all sorts of reasons but it's very fast. You're on your plane, and in walks the former president of the United States. What were you thinking at that moment?

(LAUGHTER)

LYNCH: Well, as I've said, you know, he said hello and we basically said hello, and I congratulated him on his grandchildren, as people tend to do. And that led to a conversation about those grandchildren, who do sound great.

(LAUGHTER)

And that led to a conversation about his travels, and he told me what he had been doing in Phoenix and various things. And then we spoke about, you know, former Attorney General Janet Reno. But it really was a social meeting, and it was -- it was -- it really was in that regard.

He spoke to me, spoke to my husband for some time on the plane, and then we moved on. As I have said before, though, I do think that no matter how I viewed it, understand how people view it. And I think because of that, and because of the fact that it has now cast a shadow over how this case may perceived, no matter how it's resolved, it is important to talk about how it will be resolved.

It's important to make it clear that that meeting with President Clinton does not have a bearing on how this matter will be reviewed, resolved and accepted by me. Because that is the question that it raises.

So, again, no matter how I viewed it -- how I viewed the meeting, I think what is important to me is, how do people viewed the Department of Justice because of that meeting? How do people view the team that is working on this case and has from the beginning, because of that meeting? How do people viewed the work that we do every day on behalf of the American people, which we strive to do with integrity and independence?

So, that is the question for me, and that is why I felt it was important to talk about what impact that meeting would have on the case, which it won't, but in order to explain that, we have to talk about how it will be resolved.

CAPEHART: Now, you've known president Clinton for a long time. He is the one who nominated you and appointed you to U.S. attorney for the Eastern District in 1999. So, I am wondering, do you have -- so, you have -- you have a relationship, is what I am trying to get at in terms of just long -- long-standing professional relationship.

So, you would be well within your right to say, get off my plane. What are you doing here?

(LAUGHTER)

Do you -- do you -- do you regret not telling the former president of the United States to leave the premises?

LYNCH: So, well, as I've said, you know, just -- I may have viewed it in a certain light, but the issue is how does it impact the work that I do and work that the Department of Justice does. And I -- I certainly would not do it again.

(LAUGHTER)

And -- you know, because it has cast a shadow over it should not, over what it will not touch. And that is why, as I've said, I think it is important to talk about how this matter will be resolved, and how the review and how the determinations and decisions will be made. You know, I can say, as I have said, it's going to be handled by career people, and then we can make announcement as to what it is, but unless people have insight into the process, you know, it's -- they're not going to be able to evaluate that.

And the most important thing for me, as the attorney general, is the integrity of this Department of Justice. And the fact that the meeting that I had is now casting a shadow over how people are going to view that work, is something that I take seriously, and deeply and painfully.

And so, I think it's important to provide as much information as we can, so that people can have a full view of how we do our work, and why we do our work, and how this -- how this case is going to be resolved, as well as how all the cases that we look at are going to be resolved.

CAPEHART: And so, of course, what has happened as a result of this are people out there in the world who are saying, see, this is an example of the system that is rigged against the rest of us.

And you just said that -- that this whole incident has been painful, is one of the -- one of the words -- one of the words you used. What would you say to the American people who might -- who believe that yes, indeed, this is an example of Washington rigged against them?

LYNCH: You know, I think that people have a whole host of reasons to have questions about how we in government do our business, and how we handle business and how we handle matters.

And I think that, again, I understand that my meeting on the plane with former President Clinton could give them another reason to have questions and concerns also. And that is something that -- and that's where I thought -- that's why I said it's painful to me, because the integrity of the Department of Justice is important.

And what I would say to people is to look at the world that we do; look at the matters that we work on every day, whether they involve a high profile matter or a matter where you've never heard of the person.

Look at the victims that we deal with every day. Look at the people that we protect every day, because that's our mission. And to the extent that this issue has overshadowed that mission, yes, that's painful to me.

And so, I think it's important that we provide as much information as we can, so people can have faith and confidence in the work of the department and the work of the people who carry on this work every day.

**CAPEHART:** And last question on this. So, when might we expect your acceptance of these findings and determination?

(LAUGHTER)

Are we looking at weeks, months, days?

**LYNCH:** Well -- so, in terms of timing, I actually don't know that, because again, I don't have that insight into -- into this, I'd say the nuts and bolts of the investigation at this point in time.

They're working on it; they're working on it very hard. They're working on it to make sure that they're as thorough as they can be, that they've covered every angle, that they've looked at every issue. They're doing the work that the people in the Department of Justice do every single day.

And I could not be more proud of that work. And I could not be more proud to present that work to the American people, when this matter is resolved. And we can let people know the conclusions of this investigation.

**CAPEHART:** Moving on...
(end of relevant comments)

**Franklin, Shirlethia (OAG)**

| | |
|---|---|
| **From:** | Franklin, Shirlethia (OAG) |
| **Sent:** | Tuesday, June 28, 2016 1:22 PM |
| **To:** | ⬜ (SECD) (FBI); ⬜ (SECD) (FBI); ⬜ ⬜ (LV) (FBI) |
| **Subject:** | Fwd: Bill Clinton meeting? |

b6 -1
b7C -1

FYI - stepping out to deal with this.

Shirlethia

Begin forwarded message:

From: "Lewis, Kevin S. (OPA)" <kslewis@jmd.usdoj.gov<mailto:kslewis@jmd.usdoj.gov>>
Date: June 28, 2016 at 10:18:08 AM MST
To: "Pokorny, Carolyn (OAG)" <cpokorny@jmd.usdoj.gov<mailto:cpokorny@jmd.usdoj.gov>>
Cc: "Newman, Melanie (OPA)" <mnewman@jmd.usdoj.gov<mailto:mnewman@jmd.usdoj.g
ov>>, "Axelrod, Matthew (ODAG)" <maaxelrod@jmd.usdoj.gov<mailto:maaxelrod@jmd.usdoj.go
v>>, "Franklin, Shirlethia (OAG)" <shfranklin@jmd.usdoj.gov<mailto:shfranklin@jmd.usdoj.gov>>
, "Amuluru, Uma (OAG)" <uamuluru@jmd.usdoj.gov<mailto:uamuluru@jmd.usdoj.gov>>
Subject: Re: Bill Clinton meeting?

+ SF and Uma

Sent from my iPhone

On Jun 28, 2016, at 10:15 AM, Pokorny, Carolyn (OAG) <cpokorny@jmd.usdoj.gov<mailto:cpokorny
@jmd.usdoj.gov>> wrote:

+Matt.
I'm free.
I will get a conference call line.

Carolyn Pokorny
Office of the Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530
Email: carolyn.pokorny@usdoj.gov<mailto:carolyn.pokorny@usdoj.gov> Office: (202) 616-2372 Cell:
⬜                          **b6 per OIP**

From: Newman, Melanie (OPA)
Sent: Tuesday, June 28, 2016 1:15 PM
To: Pokorny, Carolyn (OAG); Lewis, Kevin S. (OPA)
Subject: Fwd: Bill Clinton meeting?

We need to talk. I'm on call ⬜          **b6 per OIP**

FBI-12

We need to talk. I'm on cell           **b6 per OIP**

Begin forwarded message:
From: "Levine, Mike"                     **b6 per OIP**
Date: June 28, 2016 at 1:14:13 PM EDT
To: Melanie Newman <Melanie.Newman@usdoj.gov<mailto:Melanie.Newman@usdoj.gov>>, Kevin
Lewis <Kevin.S.Lewis@usdoj.gov<mailto:Kevin.S.Lewis@usdoj.gov>>
Subject: Bill Clinton meeting?
Hey guys, wanted to address something ASAP... Apparently our affiliate in Phoenix is hearing that the
AG met with Bill Clinton on a plane last night for close to an hour. They seem to think it's somehow
connected to the Benghazi report released today (I'm not sure what the connection would be). But
hoping I can provide them some guidance ASAP. Thanks

—Mike

FBI-13

**(SECD) (FBI)**

| | | |
|---|---|---|
| **From:** | (SECD) (FBI) | b6 -1,2 |
| **Sent:** | Saturday, July 02, 2016 2:28 PM | b7C -1,2 |
| **To:** | | |
| **Subject:** | Re: EXCLUSIVE: Security Source Details Bill Clinton Maneuver to Meet Loretta Lynch – Observer | |

Thank you Sir, I appreciate that.

----- Original Message -----
From:                                                                              b6 -1,2
Sent: Saturday, July 02, 2016 02:19 PM                               b7C -1,2
To:                    (SECD) (FBI)
Subject: Re: EXCLUSIVE: Security Source Details Bill Clinton Maneuver to Meet Loretta Lynch - Observer

Thank you for the response. I'd like to think I learned a little about security, watching the high level of professionalism of your team.☐

b6 -1,2
b7C -1,2

> On Jul 2, 2016, at 1:47 PM,                    (SECD) (FBI)                              wrote:
>
> Sir,
>
> Thank you for the article.
>
> I agree with your assessment about the source, which in reading the article, I believe was one of the local PD officer assisting with one of the two motorcade there on the Tarmac. Either way, they should have never offered any type of opinion or details of what did or didn't happen, as this is the most principle and basic tenant of executive protection.
>
> Unfortunately, this article is a breach in security protocol and I am addressing it with the Phoenix division to make certain that they pursuit this and identify the source of the breach.
>
> The fortunate piece of this article is that the majority of the tactics and logistics that the article mentions are textbook procedures and industry standard for most executive protection details.
>
> Let me know if have any other questions or concerns.
>
> Thank you,
>                              b6 -1
>                              b7C -1
>

FBI-14

>
>
> ----- Original Message -----
> From: [                                    ]                                    b6 -1,2
> Sent: Saturday, July 02, 2016 12:09 PM                                        b7C -1,2
> To: [                    ] (SECD) (FBI)
> Subject: EXCLUSIVE: Security Source Details Bill Clinton Maneuver to Meet Loretta Lynch - Observer
>
>
> https://www.google.com/amp/observer.com/2016/07/exclusive-security-source-details-bill-clinton-maneuver-to-meet-loretta-lynch/amp/?client=safari#
>
> Good morning, sir
>
> I've attached a news article that I thought you might be interested in. The so called "informant" talks about what happened on the tarmac at the airport, which sounds somewhat accurate. But, what I found most disturbing was the mentioning of security procedures by FBI and/or Secret Service.
> Hey, I'm just a layman, but this person sounds like a security threat to me. Please read the article (if you haven't already) because I'd love to get your opinion on this. Feel free to call me on my cell, if that's easier than emailing.
>
> Thanks,
> [                    ]                          b6 -2
                                                 b7C -2

(SECD) (FBI)

b6 -1
b7C -1

**From:** (SECD) (FBI)
**Sent:** Sunday, July 03, 2016 2:06 PM
**To:** (LV) (FBI); (SECD) (FBI); (SECD) (FBI); (SECD) (FBI); (SECD) (FBI); (NY) (FBI); (SECD) (FBI); (NY) (FBI); (HO) (FBI); (HO) (FBI); (SECD FBI); (SECD) (FBI); (CG) (FBI); (SECD) (FBI); (SECD) (FBI); (SECD) (FBI); (WF) (FBI); (SECD) (FBI); (SECD (FBI); (SECD) (FBI); (SECD) (FBI)

b6 -1
b7C -1

**Cc:** (SECD) (FBI)
**Subject:** Must Read Security Article

All,

Please read the attached article, regarding the AG's meeting with Clinton. I believe that the source quoted in this article is one of the local Phoenix LEO's. Needless to say that I have contacted the Phoenix office and will contact the local's who assisted in an attempt to stem any further damage. This is exactly why our Discretion and Judgement are the foundation of the AG's trust in our team, which is why we can never violate that trust, like the source did in this article.

http://observer.com/2016/07/exclusive-security-source-details-bill-clinton-maneuver-to-meet-loretta-lynch/

Thank you,

b6 -1
b7C -1

[blacked out] (SECD) (FBI)

**From:** [blacked out] (SECD) (FBI)                                    b6 -1
**Sent:** Sunday, July 03, 2016 2:18 PM                              b7C -1
**To:** [blacked out] (SECD) (FBI)
**Subject:** Re: Must Read Security Article

Absolutely!

**From:** [blacked out] (SECD) (FBI)
**Sent:** Sunday, July 03, 2016 02:16 PM
**To:** [blacked out] (SECD) (FBI)                              b6 -1
**Subject:** RE: Must Read Security Article                     b7C -1

This article is infuriating

------- Original message -------
From: [blacked out] (SECD) (FBI)" [blacked out]
Date: 07/03/2016 2:05 PM (GMT-05:00)
To: [blacked out] (LV) (FBI)" [blacked out] (SECD) (FBI)"
[blacked out] (SECD) (FBI)"
[blacked out] (SECD) (FBI)" [blacked out] (SECD) (FBI)"        b6 -1
[blacked out] (NY) (FBI)"                                      b7C -1
[blacked out] (SECD) (FBI)"
[blacked out] (NY) (FBI)"
[blacked out] (HO) (FBI)"
[blacked out] (HO) (FBI)" [blacked out] (SECD (FBI)"
[blacked out] (SECD) (FBI)"
[blacked out] (CG) (FBI)" [blacked out] (SECD) (FBI)"
[blacked out] (SECD) (FBI)"
[blacked out] (SECD) (FBI)"
[blacked out] (WF) (FBI)"
[blacked out] (SECD) (FBI)" [blacked out] (SECD (FBI)"
[blacked out] (SECD) (FBI)"                                    b6 -1
[blacked out] (SECD) (FBI)"                                    b7C -1
Cc: [blacked out] (SECD) (FBI)"
Subject: Must Read Security Article

Ali,

Please read the attached article, regarding the AG's meeting with Clinton. I believe that the source quoted in this article is one of the local Phoenix LEO's. Needless to say that I have contacted the Phoenix office and will contact the local's who assisted in an attempt to stem any further damage. This is exactly why our Discretion and Judgement are the foundation of the AG's trust in our team, which is why we can never violate that trust, like the source did in this article.

http://pbserver.com/2016/07/exclusive-security-source-details-bill-clinton-maneuver-to-meet-loretta-lynch/

Thank you,
[blacked out]                          b6 -1
                                       b7C -1

FBI-17

**(SECD} (FBI)**

**From:** _____ (SECD} (FBI)                                b6 -1
**Sent:** Sunday, July 03, 2016 2:53 PM                                   b7C -1
**To:** _____ (SECD} (FBI)
**Subject:** Re: Must Read Security Article


That might not be a bad idea, given the circumstances.

**From:** _____ (SECD} (FBI)
**Sent:** Sunday, July 03, 2016 02:45 PM                    b6 -1
**To:** _____ (SECD) (FBI)                       b7C -1
**Subject:** RE: Must Read Security Article

You think there will be a need for non-disclosure agreements in the future?

SA _____
Federal Bureau of Investigation
Attorney General's Protection Detail              b6 -1
_____ (cell)                            b7C -1
_____ (office)


-------- Original message --------
**From:** _____ (SECD} (FBI)"
**Date:** 07/03/2016 2:05 PM (GMT-05:00)
**To:** _____ {LV} {FBI}"                        _____ {SECD} (FBI)"
_____ {SECD} (FBI)"
_____ {SECD} (FBI)"              _____ {SECD} (FBI)"
_____ {NY} {FBI}"                  b6 -1
_____ {SECD} (FBI)"                b7C -1
_____ {NY} {FBI}"
_____ {HO} {FBI}"
{HO} {FBI}"                        _____ {SECD (FBI)"
_____ {SECD} (FBI)"
_____ {CG} {FBI}"              _____ {SECD} (FBI)"
_____ {SECD} (FBI)"
_____ {SECD} (FBI)"
_____ {WF} {FBI}"
{SECD} (FBI)"                         _____ {SECD (FBI)"
_____ {SECD} (FBI)"            b6 -1
_____ {SECD} (FBI)"            b7C -1
**Cc:** _____ {SECD} (FBI)"      _____
**Subject:** Must Read Security Article

All,

Please read the attached article, regarding the AG's meeting with Clinton. I believe that the source quoted in this article is
one of the local Phoenix LEO's. Needless to say that I have contacted the Phoenix office and will contact the local's who

... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
assisted in an attempt to stem any further damage. This is exactly why our Discretion and Judgement are the foundation of the AG's trust in our team, which is why we can never violate that trust, like the source did in this article.

http://observer.com/2016/07/exclusive-security-source-details-bill-clinton-maneuver-to-meet-loretta-lynch/

Thank you,

b6 -1
b7C -1

[REDACTED] (SECD) (FBI)

**From:** [REDACTED] (SECD) (FBI)
**Sent:** Sunday, July 03, 2016 5:18 PM
**To:** [REDACTED] (CG) (FBI)
**Subject:** Re: Must Read Security Article

b6 -1
b7C -1

No I think it was one the PX PD officers helping both motorcades.

**From:** [REDACTED] (CG) (FBI)
**Sent:** Sunday, July 03, 2016 05:12 PM
**To:** [REDACTED] (SECD) (FBI)
**Subject:** RE: Must Read Security Article

b6 -1
b7C -1

Do you think it was a swat guy?

--

-------- Original message --------
**From:** [REDACTED] (SECD) (FBI) [REDACTED]
**Date:** 07/03/2016 5:12 PM (GMT-05:00)
**To:** [REDACTED] (CG) (FBI) [REDACTED]
**Subject:** Re: Must Read Security Article

b6 -1
b7C -1

I'm trying to find out thru the PX STL. Hopefully, we will find out and at the very minimum, make sure he never works on any detail.

**From:** [REDACTED] (CG) (FBI)
**Sent:** Sunday, July 03, 2016 05:09 PM
**To:** [REDACTED] (SECD) (FBI)
**Subject:** RE: Must Read Security Article

b6 -1
b7C -1

We need to find that guy and bring him or her before a supervisor and opr

--

-------- Original message --------
**From:** [REDACTED] (SECD) (FBI) [REDACTED]
**Date:** 07/03/2016 2:05 PM (GMT-05:00)
**To:** [REDACTED] (LV) (FBI) [REDACTED] (SECD) (FBI) [REDACTED]
[REDACTED] (SECD) (FBI) [REDACTED]
[REDACTED] (SECD) (FBI) [REDACTED] (SECD) (FBI) [REDACTED]
[REDACTED] (NY) (FBI) [REDACTED]

b6 -1
b7C -1

FBI-20

(SECD) (FBI)"                                                    b6 -1
(NY) (FBI)"                                                      b7C -1
(HO) (FBI)"
(HO) (FBI)"                    (SECD (FBI)"
(SECD) (FBI)"
(CG) (FBI)"                    (SECD) (FBI)"
(SECD) (FBI)"
(SECD) (FBI)"
(WF) (FBI)"
(SECD) (FBI)"                  (SECD (FBI)"
(SECD) (FBI)"                                                    b6 -1
(SECD) (FBI)"                                                    b7C -1
Cc:                    (SECD) (FBI)"
Subject: Must Read Security Article

All,

Please read the attached article, regarding the AG's meeting with Clinton. I believe that the source quoted in this article is one of the local Phoenix LEO's. Needless to say that I have contacted the Phoenix office and will contact the local's who assisted in an attempt to stem any further damage. This is exactly why our Discretion and Judgement are the foundation of the AG's trust in our team, which is why we can never violate that trust, like the source did in this article.

http://observer.com/2016/07/exclusive-security-source-details-bill-clinton-maneuver-to-meet-loretta-lynch/

Thank you,

                              b6 -1
                              b7C -1

**NPO**

| | |
|---|---|
| **From:** | NPO |
| **Sent:** | Thursday, June 30, 2016 2:38 PM |
| **To:** | Press (JMD) |
| **Cc:** | Carr, Peter (OPA) (JMD) |
| **Subject:** | FW: security details coordinate between Loretta Lynch/Bill Clinton? |

Susan McKee
Unit Chief
National Press Office
FBI Office of Public Affairs

office
mobile      b6  -1

**From:** Zapotosky, Matt [mailto:matt.zapotosky@washpost.com]
**Sent:** Thursday, June 30, 2016 12:44 PM
**To:** NPO
**Subject:** security details coordinate between Loretta Lynch/Bill Clinton?

HI—

Weird question, but I'm trying to confirm that the reason former president Bill Clinton knew Attorney
General Loretta Lynch was at an airport in Phoenix this week is that the agents working their respective
security details (FBI in the case of the Attorney General) were coordinating during the time they were both
on the tarmac. Is anyone able to shed light on that question of how the former president knew the Attorney
General had just landed and how a meeting between the two of them happened?

Many thanks,

Matt Zapotosky | The Washington Post
(cell)
(202) 334-5873 (office)      b6  -2

**Quinn, Richard P. (DO) (FBI)**

| | |
|---|---|
| **From:** | Quinn, Richard P. (DO) (FBI) |
| **Sent:** | Wednesday, June 29, 2016 4:55 PM |
| **To:** | Newman, Melanie (OPA) (JMD); Kortan, Michael P. (DO) (FBI) |
| **Cc:** | Lewis, Kevin S. (OPA) (JMD) |
| **Subject:** | RE: FLAG |

Copy/thanks Melanie.

Richard P. Quinn
Federal Bureau of Investigation
Media/Investigative Publicity

| | |
|---|---|
| | (o) |
| | (m) |

b6 -1

-------- Original message --------
From: "Newman, Melanie (OPA)" <Melanie.Newman@usdoj.gov>
Date: 06/29/2016 4:39 PM (GMT-05:00)
To: "Quinn, Richard P. (DO) (FBI)"                    "Kortan, Michael P. (DO) (FBI)"    b6 -1

Cc: "Lewis, Kevin S. (OPA) (JMD)" <Kevin.S.Lewis@usdoj.gov>
Subject: FLAG

I want to flag a story that is gaining some traction tonight. Daily Caller, The Hill and FOX News have picked up a local Phoenix news report about a casual, unscheduled meeting between former president Bill Clinton and the AG. It happened on Monday night. Our talkers on this are below, along with the transcript from the AG's Phoenix presser, where she was asked about this. Happy to discuss further by phone. Please let me know if you get any questions about this. Thanks.

**TRANSCRIPT**
REPORTER: Sources say that you met last night with former president Bill Clinton. Did the topic of Benghazi come up at all, or can you tell us what was discussed?

**ATTORNEY GENERAL LYNCH:** No. Actually, while I was landing at the airport, I did see President Clinton at the Phoenix airport as I was leaving, and he spoke to myself and my husband on the plane. Our conversation was a great deal about his grandchildren. It was primary social and about our travels. He mentioned the golf he played in Phoenix, and he mentioned travels he'd had in West Virginia. We talked about former Attorney General Janet Reno, for example, whom we both know, but there was no discussion of any matter pending before the department or any matter pending before any other body. There was no discussion of Benghazi, no discussion of the state department emails, by way of example. I would say the current news of the day was the Brexit decision, and what that might mean. And again, the department's not involved in that or implicated in that.

b5 per OIP

FBI-23

b5 per OIP

Melanie R. Newman
Director, Office of Public Affairs
U.S. Department of Justice
Direct: 202-305-1920
Cell:                                    b6 per OIP
@MelanieDOJ

**(DO) (FBI)**

| | | |
|---|---|---|
| **From:** | (DO) (FBI) | b6 -1 |
| **Sent:** | Friday, July 01, 2016 12:27 PM | |
| **To:** | (DO) (FBI); Kortan, Michael P. (DO) (FBI); OPA-NPO | |
| **Subject:** | RE: FBI agents-no photos story | |

Was it perhaps her security detail? They are FBI agents..

**From:** (DO) (FBI)
**Sent:** Friday, July 01, 2016 12:24 PM                    b6 -1
**To:** Kortan, Michael P. (DO) (FBI); OPA-NPO
**Subject:** FBI agents-no photos story

FYSA,
ABC's Jack Date called to ask about this claim and we hadn't heard about it prior to his call.   He's going to call DOJ to ask.

# Reporter: FBI ordered 'no photos, no pictures, no cell phones' during Clinton/Lynch meeting

### posted at 7:21 am on July 1, 2016 by Larry O'Connor

Reporter Christopher Sign of ABC 15 in Phoenix, AZ appeared on The O'Reilly Factor Thursday night to talk about his scoop involving that secret meeting between former President Bill Clinton and Attorney General Loretta Lynch.

"The former president steps into her plane. They then speak for 30 minutes privately. The FBI there on the tarmac instructing everybody around 'no photos, no pictures, no cell phones.'"

Interesting.

First of all, it isn't the FBI's job to tell journalists or private citizens they can't take photographs of a former president and the Attorney General. What were the agents going to do, arrest people for taking a picture or video?

Also, if there was nothing wrong with the meeting and it was totally innocent, why were federal agents instructed to demand no one take a picture?

Finally, let's stop focusing on the fact that this meeting was inappropriate because Clinton's *wife* is under investigation by Lynch's Justice Department. I mean, that's bad, but it's actually letting Lynch and Clinton off the hook a bit. By focusing on the appearance of conflict because *Hillary Clinton* is being investigated, we are willfully overlooking the very real conflict in the fact that *Clinton himself* is under investigation, as the <u>Grand Poo-bah at the Clinton Foundation</u>. (<u>Fox News</u>)

The FBI investigation into Hillary Clinton's use of private email as secretary of state has expanded to look at whether the possible "intersection" of Clinton Foundation work and State Department business may have violated public corruption laws, three intelligence sources not authorized to speak on the record told Fox News.

This new investigative track is in addition to the focus on classified material found on Clinton's personal server.

"The agents are investigating the possible intersection of Clinton Foundation donations, the dispensation of State Department contracts and whether regular processes were followed," one source said.

Yes, the investigation into the intersection of Clinton Foundation donations and the State Department slimes Hillary Clinton since it happened during her tenure as Secretary of State, but what about Bill Clinton? If the State Department and Hillary Clinton acted improperly or illegally by commingling staff and by granting favors to Clinton Foundation donors, isn't the Clinton Foundation, and Bill Clinton equally guilty of wrongdoing?

This may explain why the day after the surreptitious meeting in Phoenix, Lynch's Justice Department informed a judge they were going to drag their feet on the release of emails connecting the former president's foundation and the State Department. (Daily Caller)

Department of Justice officials filed a motion in federal court late Wednesday seeking a 27-month delay in producing correspondence between former Secretary of State Hillary Clinton's four top aides and officials with the Clinton Foundation and Teneo Holdings, a closely allied public relations firm that Bill Clinton helped launch.

If the court permits the delay, the public won't be able to read the communications until October 2018, about 22 months into her prospective first term as President. The four senior Clinton aides involved were Deputy Assistant Secretary of State Michael Fuchs, Ambassador-At-Large Melanne Verveer, Chief of Staff Cheryl Mills, and Deputy Chief of Staff Huma Abedin.

I guess when all of this adds up, it's clear why Lynch and her FBI agents were so intent on keeping this inappropriate meeting private.

████████████ (DO) (FBI)

**From:** ████████████ (DO) (FBI)                                      b6 -1
**Sent:** Friday, July 01, 2016 1:24 PM
**To:** ████████████ (DO) (FBI); ████████████ (DO) (FBI); Quinn, Richard P. (DO)
(FBI); Kortan, Michael P. (DO) (FBI)
**Subject:** FW: FBI agents-no photos story

**From:** ████████████ (DO) (FBI)
**Sent:** Friday, July 01, 2016 1:23 PM
**To:** ████████████ (SECD) (FBI)
**Subject:** RE: FBI agents-no photos story                            b6 -1

Thanks ████ Doubt we would say anything, but for clarification will be good to know.

████

**From:** ████████████ (SECD) (FBI)
**Sent:** Friday, July 01, 2016 1:22 PM            b6 -1
**To:** ████████████ (DO) (FBI)
**Subject:** RE: FBI agents-no photos story

Rybicki just talked to DOJ.  They are waiting to respond until they can talk to AGPD to determine exactly what
happened.  AGPD is traveling back to DC now.

-------- Original message --------
From: ████████████ (DO) (FBI)* ████████████
Date: 07.01.2016 1:13 PM (GMT-05:00)
To: ████████████ (SECD) (FBI)* ████████████                           b6 -1
Subject: FW: FBI agents-no photos story

Here's the local article – national NBC has picked it up and asked us about it.  We are reaching out to DOJ OPA
as well, but thank you for the contacts!

████

**From:** ████████████ (DO) (FBI)            b6 -1
**Sent:** Friday, July 01, 2016 12:24 PM
**To:** Kortan, Michael P. (DO) (FBI); OPA-NPO
**Subject:** FBI agents-no photos story

FYSA,

ABC's Jack Date called to ask about this claim and we hadn't heard about it prior to his call.   He's going to call

DOJ to ask.

# Reporter: FBI ordered 'no photos, no pictures, no cell phones' during Clinton/Lynch meeting

**posted at 7:21 am on July 1, 2016 by Larry O'Connor**

Reporter Christopher Sign of ABC 15 in Phoenix, AZ appeared on The O'Reilly Factor Thursday night to talk about his scoop involving that secret meeting between former President Bill Clinton and Attorney General Loretta Lynch.

"The former president steps into her plane. They then speak for 30 minutes privately. The FBI there on the tarmac instructing everybody around 'no photos, no pictures, no cell phones.'"

Interesting.

First of all, it isn't the FBI's job to tell journalists or private citizens they can't take photographs of a former president and the Attorney General. What were the agents going to do, arrest people for taking a picture or video?

Also, if there was nothing wrong with the meeting and it was totally innocent, why were federal agents instructed to demand no one take a picture?

Finally, let's stop focusing on the fact that this meeting was inappropriate because Clinton's *wife* is under investigation by Lynch's Justice Department. I mean, that's bad, but it's actually letting Lynch and Clinton off the hook a bit. By focusing on the appearance of conflict because *Hillary Clinton* is being investigated, we are willfully overlooking the very real conflict in the fact that *Clinton himself* is under investigation, as the Grand Poo-bah at the Clinton Foundation. (Fox News)

The FBI investigation into Hillary Clinton's use of private email as secretary of state has expanded to look at whether the possible "intersection" of Clinton Foundation work and State Department business may have violated public corruption laws, three intelligence sources not authorized to speak on the record told Fox News.

This new investigative track is in addition to the focus on classified material found on Clinton's personal server.

"The agents are investigating the possible intersection of Clinton Foundation donations, the dispensation of State Department contracts and whether regular processes were followed," one source said.

Yes, the investigation into the intersection of Clinton Foundation donations and the State Department slimes Hillary Clinton since it happened during her tenure as Secretary of State, but what about Bill Clinton? If the State Department and Hillary Clinton acted improperly or illegally by commingling staff and by granting favors to Clinton Foundation donors, isn't the Clinton Foundation, and Bill Clinton equally guilty of wrongdoing?

This may explain why the day after the surreptitious meeting in Phoenix, Lynch's Justice Department informed a judge they were going to drag their feet on the release of emails connecting the former president's foundation and the State Department. (Daily Caller)

Department of Justice officials filed a motion in federal court late Wednesday seeking a 27-month delay in

producing correspondence between former Secretary of State Hillary Clinton's four top aides and officials with the Clinton Foundation and Teneo Holdings, a closely allied public relations firm that Bill Clinton helped launch.

If the court permits the delay, the public won't be able to read the communications until October 2018, about 22 months into her prospective first term as President. The four senior Clinton aides involved were Deputy Assistant Secretary of State Michael Fuchs, Ambassador-At-Large Melanne Verveer, Chief of Staff Cheryl Mills, and Deputy Chief of Staff Huma Abedin.

I guess when all of this adds up, it's clear why Lynch and her FBI agents were so intent on keeping this inappropriate meeting private.

FBI-29